208 F.3d 1102 (9th Cir. 2000)
 DAVID RICK BALCORTA,Plaintiff-Appellee,
v.
TWENTIETH CENTURY-FOX FILM CORPORATION, a unit of 20 "Film Corporation"; ENTERTAINMENT PARTNERS, DOES 1-5 inclusive,Defendants-Appellants.
 No. 98-56547
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 13, 1999
Filed April 6, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Jeffrey F. Webb, Los Angeles, California, for the defendant appellants.
 Elizabeth Rosenfeld, Wohlner, Kaplon, Phillips, Young & Barsh, Encino, California, for the plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; Richard A. Paez, District Judge, Presiding. D.C. No.CV-98-02653-RAP/MAN
 Before: Stephen Reinhardt, Michael Daly Hawkins, and Susan P. Graber,[1] Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 The plaintiff, David Balcorta, sued his employer, Twentieth Century Fox Film Corporation, in state court for violations of a California wage law. Fox removed the case to federal court on the ground that the claims were "completely preempted" by federal labor law. It then moved for summary judgment, and Balcorta moved to remand the case to state court. The district court granted Balcorta's motion and awarded him attorney's fees. Fox was precluded from appealing the remand order, but it appealed the award of fees. We affirm.
 
 I. BACKGROUND
 
 2
 During the time relevant to the present dispute, Balcorta worked in the film industry as an electrical rigger. The unique circumstances of the motion picture industry result in studios often employing electrical riggers and other industry technicians for very short periods of time -sometimes for only a few days. To govern the conditions of employment in these unusual circumstances, the Alliance of Motion Picture & Television Producers has entered into a master collective bargaining agreement with the International Alliance of Theatrical Stage Employees and the Moving Pictures Technicians, Artists and Allied Crafts of the United States and Canada. Nearly every film industry employer enters into an individual collective bargaining agreement with its employees that makes the parties subject to this master labor agreement, and Fox is no exception. Balcorta is a member of The Studio Electrical Lighting Technicians, Local 728, which has such an individual agreement with Fox. Therefore, the conditions of Balcorta's employment as an electrical rigger for Fox were governed by the terms of Fox's individual collective bargaining agreement with Local 728 and the industry's master labor agreement.
 
 
 3
 Balcorta worked several short-term "calls" for Fox in 1997. In 1998, he filed a complaint against Fox with the California Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE), alleging that Fox had violated S 201.5 of the California Labor Code on eleven occasions by not paying him within 24 hours of his discharge from "calls" he worked for Fox.[2] For each of the eleven infractions, Balcorta requested statutory late payment penalties, which S 203 of the California Labor Code provides for violations of S 201.5.[3]
 
 
 4
 Fox removed the DLSE action to federal court on March 12, 1998, on the basis of federal question jurisdiction under 28 U.S.C. S 1331. In spite of the removal, the California Labor Commissioner held a hearing in the action on March 13, 1998, and ruled in favor of Balcorta on all his claims, awarding him $14,208 in statutory waiting-time penalties.[4] Fox appealed the Commissioner's ruling to the Municipal Court, and then removed that action to federal court as well. Both of the removed cases were assigned to the same judge, who treated them as a single action.
 
 
 5
 Before the district court, Balcorta moved to remand the case to state court for lack of federal question jurisdiction. He also moved for attorney's fees pursuant to 28 U.S.C.S 1447. At the same time, Fox moved for summary judgment, alleging that S 301 of the Labor Management Relations Act (LMRA) preempted Balcorta's state law claims. Fox requested, in the alternative, an order requiring Balcorta to arbitrate his claim under the collective bargaining agreement.
 
 
 6
 The district court held that California Labor CodeS 201.5 created an independent, nonnegotiable state law right, and that interpretation of the collective bargaining agreement was not required for resolution of Balcorta's claims. It therefore denied Fox's motion for summary judgment, remanded the case to state court, and awarded Balcorta $1,950 in attorney's fees for Fox's wrongful removal of the case. Fox appealed the award of attorney's fees.
 
 II. JURISDICTION AND STANDARD OF REVIEW
 
 7
 Although we do not have jurisdiction to review directly the district court's decision under 28 U.S.C. S 1447(c) to remand the case to state court, see 28 U.S.C. S 1447(d); Things Remembered Inc. v. Petrarca, 516 U.S. 124, 127-28 (1995), we do have jurisdiction to review the district court's award of attorney's fees under S 1447(c); see Moore v. Permanente Med. Group, Inc., 981 F.2d 443, 447 (9th Cir. 1992). We review such awards only for abuse of discretion. See id. Under that standard, we will overturn the award if it is based on an erroneous determination of law -that is, if the district court wrongly determined that the case should be remanded to state court.[5] See id.; Baddie v.Berkeley Farms, Inc., 64 F.3d 487, 490 (9th Cir. 1995). Thus, although we have jurisdiction to review only the award of attorney's fees, our review of that award must include a de novo examination of whether the remand order was legally correct. See Moore , 981 F.2d at 447 (noting that this examination does not constitute an impermissible review of the remand order, because even if the court determines that the remand order is erroneous it is not empowered to reverse that order).[6]
 
 
 8
 III. DISCUSSION A.
 
 
 9
 As the above discussion makes clear, the validity of the district court's award of attorney's fees to Balcorta turns on whether it correctly concluded that no federal question jurisdiction existed. The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987). This rule makes a plaintiff the master of his complaint: it allows him to avoid federal jurisdiction by relying exclusively on state law. Thus, it is "settled law that a case may not be removed to federal court on the basis of a federal defense, including a defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal., 463 U.S. 1, 14 (1983).
 
 
 10
 There does exist, however, a corollary to the wellpleaded complaint rule, known as the "complete preemption" doctrine. The Supreme Court has concluded that the preemptive force of some statutes is so strong that they "completely preempt" an area of state law. See Metropolitan Life Ins. Co. v. Taylor, 41 U.S. 58, 65 (1987). In such instances, any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law. See Franchise Tax Bd., 463 U.S. at 24.[7]
 
 
 11
 The "complete preemption" exception to the wellpleaded complaint rule is applied primarily underS 301 of the LMRA. Section 301(a) provides:
 
 
 12
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 13
 29 U.S.C. S 185(a). In a series of opinions, the Supreme Court concluded that S 301's jurisdictional grant required the "complete preemption" of state law claims brought to enforce collective bargaining agreements. The Court took the first step toward fashioning the complete preemption doctrine in Textile Workers v. Lincoln Mills, 353 U.S. 448 (1957). In that case, the Court "held that S 301 not only provides federal court jurisdiction over controversies involving collective-bargaining agreements, but also `authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.' " Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 403 (1988) (quoting Textile Workers, 385 U.S. at 451). The Court went on to analyze the preemptive force of this federal common law in Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flower Co. 369 U.S. 95 (1962). In that case, the Court held that, because the subject matter of S 301 "is peculiarly one that calls for uniform law," a state law that purports to define the meaning or scope of a term in a labor contract suit is preempted by federal labor law.[8] See id., 369 U.S. at 103-04. Finally, in Avco Corp. v. Aero Lodge No. 735, the Court held that, in addition to preempting state law claims centered on the enforcement of collective bargaining agreements, the application of S 301 led to "complete preemption," converting those state law claims into federal ones:
 
 
 14
 The pre-emptive force of S 301 is so powerful as to displace entirely any state cause of action "for viola tion of contracts between an employer and a labor organization." Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of S 301.
 
 
 15
 Franchise Tax Bd., 463 U.S. at 23 (explaining the decision in Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers, 390 U.S. 557 (1968)).
 
 
 16
 Although the language of S 301 is limited to "[s]uits for violation of contracts," courts have concluded that, in order to give the proper range to S 301's policies of promoting arbitration and the uniform interpretation of collective bargaining agreement provisions, S 301 "complete preemption" must be construed to cover "most state-law actions that require interpretation of labor agreements." Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers, 109 F.3d 1353, 1356 (9th Cir. 1997); see also Lueck , 471 U.S. at 210-11.[9] One reason for expanding complete preemption beyond the textual confines of S 301 is that any claim the resolution of which requires the interpretation of a collective bargaining agreement presents some risk to the policy of uniformity if state law principles are employed in that interpretation, even if the claim is not one for breach of contract. See Lingle, 486 U.S. at 405-06; Livadas , 512 U.S. at 121-23. Moreover, extending complete preemption to cover claims involving interpretation of collective bargaining agreements promotes the federal policy favoring arbitration of labor disputes, because it prevents parties from "evad[ing] the requirements of S 301 by relabeling their contract claims as claims for tortious breach of contract." Lueck, 471 U.S. at 211; see also Livadas, 512 U.S. at 123.[10]
 
 
 17
 There is another strand to this aspect of federal labor law, however. Despite the breadth of S 301 complete preemption, "not every claim which requires a court to refer to the language of a labor-management agreement is necessarily preempted." Associated Builders & Contractors, Inc., 109 F.3d at 1357. In order to help preserve state authority in areas involving minimum labor standards, the Supreme Court has distinguished between claims that require interpretation or construction of a labor agreement and those that require a court simply to "look at" the agreement. See Livadas, 512 U.S. at 123-26, 124 ("[W]hen the meaning of contract terms is not subject to dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."). We have stressed that, in the context of S 301 complete preemption, the term "interpret" is defined narrowly -it means something more than "consider," "refer to," or "apply." See Associated Builders & Contractors, 109 F.3d at 1357; Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 748-49 (9th Cir. 1993); Milne Employees Ass'n v. Sun Carriers, Inc., 960 F.2d 1401, 1409-10 (9th Cir. 1991). Although "the line between reference to and interpretation of an agreement may be somewhat hazy," Ramirez, 998 F.2d at 749, the totality of the policies underlying S 301 -promoting the arbitration of labor contract disputes, securing the uniform interpretation of labor contracts, and protecting the states' authority to enact minimum labor standards -guides our understanding of what constitutes "interpretation."
 
 B.
 
 18
 Section 201.5 of the California Labor Code requires that Fox pay Balcorta no more than "24 hours after discharge." Cal. Lab. Code S 201.5 (1997). Fox argues that, in spite of the seeming clarity of the statutory command, Balcorta's claims under S 201.5 are completely preempted because their resolution requires interpreting the collective bargaining agreement in order to determine (1) what constitutes a "discharge" for purposes of his claims, and (2) what constitutes timely payment of wages for purposes of his claims.[11]
 
 
 19
 1. "Discharge"
 
 
 20
 The district court held that the determination whether Balcorta was discharged on the eleven occasions of which he complained of required the resolution of only "purely factual issues that may be ascertained without the need to interpret the local 728 collective bargaining agreement." Fox disagrees, asserting that several paragraphs of the collective bargaining agreement -paragraphs 14, 15, and 18 -must be interpreted in order to determine whether Balcorta was in fact discharged. With respect to paragraphs 15 and 18, however, Fox provides no argument to support its bare assertion that a court must interpret those provisions to determine whether Balcorta was discharged. The lack of support for its contention is not surprising, because a cursory examination of the paragraphs reveals that they do nothing more than prohibit certain types of employee "calls" and limit the manner in which Fox may change or cancel other types of "calls."[12] In short, these provisions simply prescribe certain procedures and timing requirements for the making, changing, and cancellation of "calls." Although the provisions do detail fairly complicated procedures and contain a hefty dose of industry jargon, their meaning is neither uncertain nor ambiguous. A court may be required to read and apply these provisions in order to determine whether an employee was discharged from his"call" at the end of his shift, but no interpretation of the provisions would be necessary.
 
 
 21
 Fox also contends that a court cannot determine whether Balcorta was discharged without interpreting the following language in paragraph 14 of the collective bargaining agreement: "Any employee not personally notified of his discharge at the end of his shift, who reports for work at his next regular shift, shall be considered as having been called for a minimum call."[13] We have difficulty understanding why Fox thinks this straightforward language requires interpretation, especially in light of the fact that Fox appears to have acknowledged before the district court that the meaning of the provision "clearly" requires that an employee be notified of a discharge at the end of the shift in order for discharge to occur.
 
 
 22
 On close examination, it appears to us that Fox is actually not contending that paragraph 14 is ambiguous, but is instead arguing that the claim Balcorta asserted in his testimony before the Labor Commissioner was inconsistent with the terms of the provision. Whether Balcorta's testimony as to why he was entitled to be paid a penalty is inconsistent with the applicable provision of the collective bargaining agreement has no bearing, however, on our conclusion that the provision itself requires only application and not interpretation.[14] If Balcorta believed that he was discharged under circumstances in which the collective bargaining agreement states that he is not, then he will be unable to prevail on the merits of his claims. His misunderstanding, however, cannot render a plain provision ambiguous.[15]
 
 
 23
 In short, determining whether Balcorta was discharged does not require a court to interpret the collective bargaining agreement between Fox and Local 728, and thus does not render Balcorta's claims subject to complete preemption.
 
 2. Timely Payment
 
 24
 In addition to arguing that a court must interpret the collective bargaining agreement to determine whether Balcorta was discharged, Fox argues that the agreement must be interpreted to determine whether Balcorta was paid within the time allowed by the agreement. It is true that the collective bargaining agreement contains a paragraph that sets forth time requirements governing the payment of wages after discharge.[16]We need not decidewhether the collective bargaining agreement's provision governing the payment of wages is ambiguous and requires interpretation, however, becauseS 201.5 of the Labor Code governs the timeliness of payment following discharge. Accordingly, whether a violation has occurred is controlled only by the provisions of the state statute and does not turn on whether the payment was timely under the provisions of the collective bargaining agreement. Cf. Wright v. Universal Maritime Serv. Corp., 119 S. Ct. 391, 395-96 (1998). The measure of timeliness under S 201.5 could not be more plain: once an employee covered by the law is discharged, state law requires payment "within 24 hours." On its face, S 201.5 requires nothing more than a clock or a calendar to determine the timeliness of Fox's payment -the law does not require us even to refer to the collective bargaining agreement, let alone interpret it.
 
 
 25
 It may be Fox's contention that, even if the calculation of timely payment under S 201.5 does not require interpreting the collective bargaining agreement, Balcorta's claims are completely preempted because the collective bargaining agreement supersedes state law regarding the timing of wage payments after a discharge. First, Fox may be arguing that state law permits the parties to adopt timing-of-payment requirements that differ from the minimum labor standards enacted in S 201.5 and thereby render the state's standards inapplicable. In such case, the argument continues, it would indeed be the collective bargaining agreement that we would be required to construe, and complete preemption would ensue. Alternatively, Fox may be arguing that even if the state law does not authorize a waiver of its requirements, S 301 permits such a waiver. In either case, Fox's argument is without merit. The rights granted to employees by California Labor Code S 201.5 are not subject to negotiation, and S 301 of the LMRA does not grant private parties the power to waive nonnegotiable state rights.
 
 
 26
 When the California legislature enacted the Chapter of the Labor Code that includes S 201.5, it explicitly made the rights conferred in that chapter nonnegotiable. Section 219 of the 1997 Labor Code states: "[N]o provision of this article can in any way be contravened or set aside by a private agreement, whether written, oral, or implied." This legislature could not have spoken more clearly, and we agree with the Supreme Court that S 219 purports to "preclude[ ] any private contractual waiver of the[ ] minimum labor standards" set forth in the Code. See Livadas, 512 U.S. at 110, 128.
 
 
 27
 Moreover, S 301 does not permit parties to waive, in a collective bargaining agreement, nonnegotiable state rights like those conferred by S 201.5. See Associated Builders & Contractors, 109 F.3d at 1357. Were we to extend the S 301 complete preemption doctrine to allow for preemption by virtue of such a waiver, "parties would be able to immunize themselves from suit under state-laws of general applicability by simply including their unlawful behavior in a labor contract." Id.; see also Miller v. AT&T Network Sys., 850 F.2d 543, 546 (9th Cir. 1988); Lingle, 486 U.S. at 412 (noting that such a rule would intrude on the traditional power of states to establish minimum labor standards). For this reason, we have held that such a rule would "clearly exceed[ ] the scope of S 301 preemption intended by Congress." Associated Builders & Contractors, Inc., 109 F.3d at 1357. As the Supreme Court stated in Lueckwith respect to state laws that are not otherwise preempted or unlawful:
 
 
 28
 Section 301 on its face says nothing about the sub stance of what private parties may agree to in a labor contract. Nor is there any suggestion that Congress, in adopting S 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation. Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored. Clearly, S 301 does not grant the parties to a collective-bargaining agreement the ability to con tract for what is illegal under state law . . . .[I]t would be inconsistent with congressional intent under that section to preempt state rules that pro scribe conduct, or establish rights and obligations, independent of a labor contract.
 
 
 29
 Lueck, 471 U.S. at 211-12; see also Lingle, 486 U.S. at 409; cf. Livadas, 512 U.S. at 125. Therefore, Fox cannot claim S 301 complete preemption on the ground that the parties agreed in the collective bargaining agreement to waive the statutory rights conferred by S 201.5.
 
 CONCLUSION
 
 30
 Because S 301 of the LMRA does not completely preempt Balcorta's claims under S 201.5 of the California Labor Code, the district court correctly concluded that his case should be remanded to state court for lack of subject matter jurisdiction. Accordingly, the district court did not abuse its discretion in awarding attorney's fees to Balcorta.
 
 
 31
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Judge Graber was drawn to replace Judge Wiggins, who was on the original panel but died before this disposition was filed.
 
 
 [2]
 When the DLSE ruled on Balcorta's claim, S 201.5 required in part:
 An employer who lays off a group of employees engaged in the production of motion pictures whose unusual or uncertain terms of employment require special computation in order to ascertain the amount due, shall be deemed to have made immediate pay ment within the meaning of Section 201 if the wages of such employees are paid within such reasonable time as may be neces sary for computation of payment thereof; provided, however, that such reasonable time shall not exceed 24 hours after discharge . . . .
 Cal. Lab. Code S 201.5 (1997). Section 201.5 was later amended, and the statute now requires an employer to pay a discharged employee no later than the next scheduled payday. See Cal. Lab. Code S 201.5 (1999).
 
 
 [3]
 Section 203 provides the penalty for violations of S 201.5:
 If an employer willfully fails to pay, without abatement or reduc tion, in accordance with SS 201, 201.5, and 202, any wages of an employee who is discharged or quits, the wages of such employ ees shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefore is commenced; but such wages shall not continue for more than 30 days . . . .
 Cal. Lab. Code S 203 (1997). Balcorta sought only the penalty and not the wages for the period prior to his discharge, because Fox had paid in full all the wages he had actually earned by the time he filed his action with the DLSE.
 
 
 [4]
 Balcorta's original DLSE complaint alleged late payments on 11 occasions. Before the commissioner's ruling he withdrew one of the claims, and the Commissioner ruled in his favor on the remaining 10.
 
 
 [5]
 Under the abuse-of-discretion standard, we would also overturn the district court's award if it was based on a clearly erroneous finding of fact. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Corder v. Gates, 947 F.2d 374, 377 (9th Cir. 1991). In the present case, however, the defendants allege only that the district court abused its discretion by rendering an erroneous legal determination.
 
 
 [6]
 The district court suggested in its order that it would not award attorney's fees to Balcorta if Fox's attempt to remove the action was "fairly supportable." Although it may be within the discretion of the district court not to award fees under such circumstances, the above discussion makes clear that our case law does permit an award of fees when a defendant's removal, while "fairly supportable," was wrong as a matter of law. It appears that the district court drew its understanding that fees are inappropriate where removal is "fairly supportable" from Schmitt v. Insurance Co. of North America, 845 F.2d 1546 (9th Cir. 1988), in which we held that "[a]n award of attorney's fees is inappropriate . . . where the defendant's attempt to remove the action was fairly supportable and where there has been no showing of bad faith." Id. at 1552 (emphasis added). Schmitt was decided in 1988, however, at a time when S 1447(c) provided only that the district court could, after remand, award "just costs." 28 U.S.C. S 1447(c)(1987). After Schmitt was decided, Congress amended S 1447(c) to provide that "an order remanding the case may require payment of just costs and any actual expenses, including attorney's fees, incurred as a result of removal." 28 U.S.C. S 1447(c) (1998). In Moore, we explained that a finding of bad faith was required to award fees pursuant to the pre-amendment provision because that version did not statutorily authorize fees -it authorized only costs. Under the "American Rule, " a finding of bad faith was required in the absence of statutory (or contractual) authorization. See Moore, 981 F.2d at 446. We further explained that it was the bad faith standard that led to the "fairly supportable" inquiry: "If the bad faith standard is utilized, we must examine whether the attempt to remove was `fairly supportable . . . .' " Id. at 447 (citing Schmitt). But the amendment to S 1447(c), the Moore court held, did away with that requirement by providing statutory authorization for fees and by deleting the pre-amendment prerequisite that the case have been "removed improvidently": "Indeed, the statute as amended makes no reference at all to the state of mind or intent of the party removing the action, instead focusing strictly on the mere absence of subject matter jurisdiction." Id. at 446 (internal quotation marks omitted). For that reason, the court articulated a new standard of review for fee awards under S 1447(c): "Given the wide discretion provided the district court by S 1447(c), we will review an award of attorney's fees under this statute for abuse of discretion." Id. at 447. Thus, the 1988 amendment to S 1447(c) superseded the standard set forth in Schmitt. See Gotro v. R&B Realty Group, 69 F.3d 1485, 1487-88 (9th Cir. 1995); see also K.V. Mart Co. v. Local 324, 173 F.3d 1221, 1223 (9th Cir. 1999) (noting that, after Moore, an award of attorney's fees under S 1447(c) is reviewed for abuse of discretion).
 
 
 [7]
 In spite of its title, the "complete preemption" doctrine is actually a doctrine of jurisdiction and is not to be confused with ordinary preemption doctrine (although it is related to preemption law). Thus, the "complete preemption" doctrine does not abrogate the standard rule that a defense of preemption does not create federal question jurisdiction. See Caterpillar, Inc., 482 U.S. at 393.
 
 
 [8]
 The Supreme Court has also recognized a second policy that supports the rule of preemption in many S 301 cases: promoting and preserving the central role of arbitration in resolving disputes under a collective bargaining agreement. See, e.g., Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 219 (1985).
 
 
 [9]
 The Supreme Court has suggested that, in order to preserve the role of states in legislating labor standards, some nonnegotiable state rights may not be completely preempted even if their resolution requires some interpretation of a collective bargaining agreement. See Livadas v. Bradshaw, 512 U.S. 107, 124 n.18 (1994).
 
 
 [10]
 Dicta from a few of our earlier complete preemption cases suggested that the doctrine extends much further than the "interpretation" test allows. In a few cases dealing with state constitutional privacy claims, we suggested that any claim that is "a properly negotiable subject for purposes of collective bargaining" is completely preempted. See Utility Workers of Am., Local No. 246 v. Southern Cal. Edison Co., 852 F.2d 1083, 1086 (9th Cir. 1988); Laws v. Calmat, 852 F.2d 430, 432-33 (9th Cir. 1988). More recently, however, we have made it clear that the outcome in those cases did not turn on the expansive dicta about complete preemption. In Stikes v. Chevron USA, Inc., 914 F.2d 1265 (9th Cir. 1990), we held that the claims in those cases were completely preempted only because their resolution required the interpretation of the collective bargaining agreement. See id. at 1269; Schlacter-Jones v. General Tel. of Cal., 936 F.2d 435, 440-41 (9th Cir. 1991). Moreover, both the Supreme Court and this court have rejected the broad swath of complete preemption that the dicta in Laws and Utility Workers of America would suggest. See Livadas, 512 U.S. at 125; Associated Builders & Contractors, 109 F.3d at 1357.
 
 
 [11]
 In addition to arguing that resolution of Balcorta's claims requires interpretation of certain collective bargaining agreement provisions, Fox argues more generally that decisions in two other circuits -Atchley v. Heritage Cable Vision Associates, 101 F.3d 495 (7th Cir. 1996), and Antol v. Esposto, 100 F.3d 1111 (3rd Cir. 1997) -compel the conclusion that Balcorta's claims are completely preempted by S 301. A close examination of the two decisions reveals that they in no way undermine the conclusion that Balcorta's claims are not completely preempted. In Atchley, the Seventh Circuit held that the plaintiff's state law claims were preempted because resolution of those claims required interpretation of the collective bargaining agreement at issue. See Atchley, 101 F.3d at 500-01. Indiana state law created a claim for failure to pay wages within 10 days of "when they were due." The plaintiffs claimed that their employer had failed to pay, within 10 days, certain wage increases agreed to in a newly negotiated collective bargaining agreement. The court concluded that the parties had agreed to the wage increases, but that their agreement was unclear about when those wage increases would become effective, and thus there was uncertainty about when they were "due." See id. at 500. Because the court was required to interpret the collective bargaining agreement in order to determine when the wages were due, it held that the employees' claims were preempted. See id. at 501. Antol is equally inapposite. In that case, the state law was preempted because, in essence, it created a claim for breach of the collective bargaining agreement. See Antol, 100 F.3d at 1119-21. Thus, the law fell squarely within the scope of S 301 complete preemption. See Lueck, 471 U.S. at 220-21.
 
 
 [12]
 Paragraph 15 straightforwardly requires that the "calls" for certain "on production" employees "shall not be canceled after an employee has been dismissed for the day," and that "if, at the time of a call, the employee called is not on the employer's payroll, such call may not be canceled." Paragraph 18 is similarly plain, placing a general prohibition on "standby" and "relay" calls, and providing that "holidays or days that would otherwise constitute the sixth or seventh day worked in the employee's workweek are not considered regular days of work."
 
 
 [13]
 Paragraph 14 of the collective bargaining agreement states in full:
 14. Layoff Provisions
 This provision applies to "Off Production" employees only.
 (a) Any employee not personally notified of his discharge at the end of his shift, who reports for work at his next regular shift, shall be considered as having been called for a minimum call. Shifts commencing on days that would otherwise be the sixth or seventh day worked in the employee's workweek shall not be considered as regular shifts.
 (b) No calls may be canceled after an employee has been dis missed for the day and has left the studio premises.
 
 
 [14]
 Moreover, were we to conclude that language such as that in paragraph 14, which has an eminently plain meaning, required interpretation in order to understand, then nearly every state law claim that required reading any portion of a collective bargaining agreement would likely be completely preempted. So holding would directly contravene the Supreme Court's requirement that the term "interpretation" not be construed broadly to cover instances in which a collective bargaining agreement is merely consulted. See Livadas, 512 U.S. at 124-25.
 
 
 [15]
 We note that it may be the case that S 201.5 does not defer to the collective bargaining agreement's definition of layoff or discharge, but instead requires courts to determine whether discharge occurred by applying state common law principles. If this is true, then a court resolving Balcorta's S 201.5 claim would not even have to consult the collective bargaining agreement. We do not rest our conclusion on this interpretation of state law, however, because it is clear that no interpretation of the collective bargaining agreement is required even if Balcorta's "discharge" is governed by that agreement.
 
 
 [16]
 According to Fox, Paragraph 19 of the collective bargaining agreement exclusively governs the payment of wages upon layoff. That paragraph reads, in relevant part:
 (a) . . . When employee is laid off and requests pay at time of layoff, he shall be paid within twenty-four (24) hours, excluding Saturdays, Sundays, and holidays.
 (b) If, due to the fault of the producer, an employee does not receive wages or salary on a timely basis, the Producer shall, within three (3) days after being so notified by the employee, issue a check in payment of same to the employee. . . .