FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY MATSON,
*Plaintiff-Appellant*,

v.

UNITED PARCEL SERVICE, INC.,
*Defendant-Appellee.*

No. 13-36174

D.C. No.
2:10-cv-01528-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted May 3, 2016
Seattle, Washington

Filed November 4, 2016

Before: Susan P. Graber, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Labor Law / Preemption

The panel reversed the district court's preemption ruling; held that the district court erred in holding that an employee's state law gender-based hostile work environmental claim was preempted under § 301 of the Labor Management Relations Act (LMRA); reinstated the jury verdict from the first trial in favor of the employee; and remanded.

The panel noted the two-part test used to determine whether a state law claim is preempted under § 301 of the LMRA. At the first step, the court asks "whether a particular right inheres in state law or, instead, is grounded in a [collective bargaining agreement (CBA)]," *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1060 (9th Cir. 2007); and preemption is warranted at this step only if the claim is directly founded on rights created by the CBA. At step two, the court asks whether the state law claim can be resolved by "looking to" the CBA, in which case the claim is not preempted; or whether the claim "interprets" the CBA, in which case the claim is preempted.

The panel held that adjudication of the employee's hostile work environment claim did not require interpretation of a provision of the CBA, and preemption under § 301 of the LMRA was not warranted. Specifically, the panel rejected the employer's suggestion that the employee's claim was nothing more than a repackaged "contractual dispute" over

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the assignment of extra work. The panel concluded that the claim was not preempted under the first *Burnside* factor because it was not grounded in any right created by the CBA. The panel further held that nothing in the nature of the employee's hostile work environment claim required interpretation of the CBA. The panel also rejected the employer's argument that *Perugini v. Safeway Stores, Inc.*, 935 F.2d 1083 (9th Cir. 1991), controlled this case.

The panel held that because the district court's conclusion that the jury's damages award was "grossly excessive" rested in part on its erroneous preemption ruling, that determination was also reversed, and the panel remanded for reconsideration of the damages question.

## COUNSEL

Donald H. Mullins (argued) and Jacob D.C. Humphreys, Badgley Mullins Turner PLLC, Seattle, Washington, for Plaintiff-Appellant.

Eric D. Miller (argued), Tobias S. Piering, Javier F. Garcia, and Michael T. Reynvaan, Perkins Coie LLP, Seattle, Washington, for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

We once again address whether a state employment claim can go forward where the employee's terms and conditions of employment are covered by a collective bargaining agreement. *See Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024 (9th Cir. 2016).

This case, unlike any of the three appeals consolidated in the recent *Kobold* opinion, concerns a state equal employment claim alleging a hostile work environment. Mary Matson brought suit against her employer, United Parcel Service, Inc. ("UPS"), asserting, among other claims, a state law gender-based hostile work environment claim. A jury returned a verdict for Matson on that claim, but her victory was short-lived. The district court granted UPS's motion for a new trial on the ground that the claim was preempted under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The jury in the second trial found for UPS. Matson challenges the district court's preemption ruling. We conclude that the district court erred in holding Matson's claim preempted and so reverse.

I.

Mary Matson worked for UPS at its Boeing Field International hub in Seattle from 2002 to 2010. During most of that time Matson was employed as a "combination worker," meaning that she was responsible both for unloading and sorting packages that arrived on airplanes and for delivering them locally. Matson was part of a unit of employees represented by the International Brotherhood of

Teamsters, Local 174 ("Teamsters"). The terms and conditions of her employment were governed by a collective bargaining agreement ("CBA") between UPS and the Teamsters.

Matson frequently complained during her employment that, because of her gender, she was subject to unfair and demeaning treatment in the workplace. Among other examples of such treatment, she alleged, her supervisors routinely favored male employees when assigning what she called "extra work"—that is, package deliveries not previously assigned to a particular route. Matson valued such additional work assignments because they enabled her to "stay on the clock longer than normal, thereby increasing her pay." She filed numerous grievances through her union seeking redress for these practices. UPS responded to Matson's grievances several times by agreeing that it would consider the seniority of Matson and other employees when assigning work. Occasionally, UPS agreed to compensate Matson for thirty minutes to one hour at her overtime rate.

Unsatisfied with the results of the grievances, Matson in 2008 filed an employment discrimination and retaliation complaint with the Washington State Human Rights Commission ("WSHRC"), alleging, among other matters, that UPS "has a pattern and practice of favoring male employees by offering extra work to them." The commission denied the complaint. Matson also filed a similar charge with the Equal Employment Opportunity Commission, which adopted the findings of the WSHRC.

"Extra work" is not a defined term in Matson's CBA. The term appears just once, in a "Sort Addendum" that applies only to "Sorters, Pre-Loaders, Clerks, Car Washers,

and all other Inside Employees." The Sort Addendum does not define "extra work," but provides that UPS "recognizes that the principles of seniority shall be given prime consideration for extra work." A separate addendum to the CBA provides generally that UPS "recognizes that the principles of seniority shall be given prime consideration in the every day operation of the business."

In February 2010, UPS fired Matson for "proven dishonesty," relying on the results of an investigation into whether Matson had falsified delivery records. Matson initially contested her discharge by filing a grievance in accord with the procedures outlined in her CBA.[1] A joint Teamsters/UPS labor panel affirmed her discharge, so her case was not sent to arbitration.

Matson then filed suit against UPS in Washington state court, asserting several state law causes of action: (1) race and gender discrimination; (2) a race- and gender-based hostile work environment; (3) discrimination and retaliatory termination based on Matson's opposition to unlawful labor practices; and (4) wrongful termination, based on the filing of a workers' compensation claim.[2] UPS removed the case to

---

[1] The CBA permitted a terminated employee to file a grievance with the Teamsters appealing her termination. Once an employee filed a grievance, the employee received a hearing before a "labor panel" composed of an equal number of Teamsters and UPS representatives. The labor panel then voted on whether to affirm the termination or to reinstate the employee. The CBA required that the panel vote be unanimous. If the panel did not reach unanimity, the grievance proceeded to arbitration.

[2] Neither Matson's race-based claims nor her wrongful termination claims are at issue on appeal.

federal court on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332.

UPS then moved for summary judgment. The district court granted the motion on the merits with respect to Matson's claims for race discrimination, race-based hostile work environment, and wrongful discharge in violation of public policy, but denied summary judgment with respect to Matson's claims of gender discrimination, gender-based hostile work environment, and discrimination on the basis of opposition to unlawful practices. With regard to Matson's gender-based hostile work environment claim, UPS maintained that the claim was preempted under LMRA § 301 because it was "inextricably intertwined" with an interpretation of the CBA, but the district court rejected that contention. "[N]o interpretation would be necessary for purposes of Ms. Matson's gender-based hostile work environment claim, and plaintiff does not dispute the meaning of any of its terms," the district court concluded.

The case proceeded to trial. At trial, Matson testified that, in her view, what she termed "extra work" should have been assigned to her but was, instead, performed by male employees with less seniority. She testified that she would be "humiliated in front of [her] coworkers" and treated as "some kind of troublemaker just because [she was] asking for extra work."

In addition to her allegations regarding work assignments, Matson testified to numerous other incidents that, she contended, contributed to a hostile work environment including:

- A supervisor and other employees refused to help her lift a 150-pound package, and laughed at her as she struggled to do it alone. During that incident, one supervisor acted in an intimidating manner, as he "clenched up his fists, put them behind his back, and stepped right into [Matson's] face, gritted his teeth." Matson was forced to seek out another coworker to help her lift the package. Matson's effort to lift the package resulted in a serious back injury that caused her to miss more than a year of work.

- Various UPS managers disregarded her complaints of workplace hostility and threatened to file charges against her if she continued to make what they called "false statements."

- A male coworker screamed at her and "began to choke [her]" after she had playfully tapped his knee. In response to this incident her supervisors did nothing.

- Matson's supervisors assigned her a less desirable package car rather than a van. All of the male employees, many of whom had less seniority than Matson, were given vans.

- In the meeting in which she was terminated, she was confronted by seven men, all of whom were "very hostile." Matson was accused of both lying and stealing time, while a man involved in the same activity was not charged with stealing time.

At the close of Matson's case-in-chief, UPS moved for judgment as a matter of law, arguing once more that Matson's

hostile work environment claim was preempted under § 301. The court determined that ruling on the motion before hearing the defense witnesses would be premature.

UPS then presented witnesses who disputed Matson's claim that the additional package deliveries constituted extra work. One UPS employee stated that such deliveries were "really what I called part of normal dispatch."

After hearing UPS's witnesses, the district court denied UPS's motion for judgment as a matter of law. It explained that "preemption is not mandated simply because defendant refers to the CBA in mounting its defense." The court specifically noted that Matson had presented evidence "that work was given to men instead of her." That fact, along with the other incidents of hostility she described, "in theory, support a hostile work environment claim without reference to the CBA." Finally, the court noted that for the purposes of Matson's claim, "extra work, seniority, and prime consideration are simply a reference point that elucidates her claims. Whether or not seniority was actually given prime consideration is not necessary for determination of these claims."

Matson next offered rebuttal testimony in which she disagreed with UPS's evidence regarding the disputed work assignments. She maintained that certain package deliveries were work that should have been awarded in "seniority order," and that other such work was improperly dispatched by a male hourly employee rather than by a supervisor. When asked on cross-examination whether she had ever filed grievances against higher-seniority employees, Matson stated that "this is a very muddy area, because . . . in the contract, there's a lot of work that's considered full-time work and

part-time work. And there's a lot of different categories. . . . And all that people are trying to do is separate whose job is whose so that you know whether or not you can bid on it. And that's considered extra work."

The jury found for UPS on Matson's discrimination and retaliation claims. The jury returned a verdict for Matson, however, on her hostile work environment claim and awarded $500,000 in damages for emotional distress. The district court's jury instruction regarding Matson's hostile work environment claim did not use the term "extra work" or "seniority" or refer to the CBA; it simply stated the elements of the claim that Matson had the burden of proving.[3]

---

[3] The court instructed the jury on Matson's hostile work environment claim as follows:

> To establish her claim of hostile work environment on the basis of gender, Ms. Matson has the burden of proving each of the following propositions: (1) That there was conduct that occurred because of Ms. Matson's gender; (2) That this conduct was unwelcome in the sense that Ms. Matson regarded the conduct as undesirable and offensive, and did not solicit or incite it; (3) That this conduct was so offensive or pervasive that it altered the conditions of Ms. Matson's employment; and (4) That management knew, through complaints or other circumstances, of this conduct, and UPS failed to take reasonably prompt and adequate corrective action reasonably designed to end it.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for Ms. Matson on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for UPS on this claim.

Following the verdict, UPS filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), or, alternatively, for a partial new trial under Federal Rule of Civil Procedure 59, again arguing § 301 preemption of the hostile work environment claim. This time, the court granted the motion.

In so ruling, the district court concluded that Matson's rebuttal testimony acknowledged that the definition of "extra work" was "a very muddy area" and so "put the interpretation of extra work under the CBA directly in dispute." The court went on to hold that Matson's hostile work environment claim "with respect to 'extra work' assignments is substantially dependent on analysis of the CBA because the court would have to interpret the meaning of 'extra work.'" The court ordered a new trial, holding that jury questions remained regarding whether Matson had suffered a hostile work environment on the basis of incidents she had described that were unrelated to the assignment of "extra work." The court further held that, in light of its preemption ruling, the jury's award of $500,000 was "grossly excessive" and, "[a]ccordingly, the question of damages must be tried again as well."

After the second trial, the jury returned a verdict for UPS. This appeal followed.[4]

---

Jury Instructions at 15, *Matson v. UPS*, No. 2:10-cv-01528 (W.D. Wash. July 18, 2012).

[4] Matson makes several claims on appeal regarding various district court rulings during the second trial. Because we reverse the initial preemption ruling and hold that the first jury verdict must be reinstated, we need not and do not consider those claims.

II.

Section 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a). The Supreme Court has long construed this provision "as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) (citing *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957)). This federal common law, in turn, "preempts the use of state contract law in CBA interpretation and enforcement." *Cramer v. Consol. Freightways*, *Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (en banc) (citing *Local 174, Teamsters of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962)). Preemption under § 301 is not limited to "cases specifically alleging contract violation," *id.* (citing *Lueck*, 471 U.S. at 220), but also applies "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Lueck*, 471 U.S. at 220.

We have fashioned a two-part test to determine whether a state law claim is preempted under § 301. At the first step, we ask "whether a particular right inheres in state law or, instead, is grounded in a CBA." *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1060 (9th Cir. 2007). In making this determination we focus on "the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement, . . . and not whether a grievance arising from 'precisely the same set of facts' could be pursued." *Livadas*

*v. Bradshaw*, 512 U.S. 107, 123–24 (1994) (citation omitted) (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988)). Only if the claim is "founded directly on rights created by collective-bargaining agreements" is preemption warranted at this step. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987).

At step two, "to determine whether a state law right is 'substantially dependent' on the terms of a CBA," we ask "whether the claim can be resolved by 'look[ing] to' versus interpreting the CBA." *Burnside*, 491 F.3d at 1060 (alterations in original) (quoting *Caterpillar*, 482 U.S. at 394; *Livadas*, 512 U.S. at 125). "If the latter, the claim is preempted; if the former, it is not." *Id*. "We have stressed that . . . the term 'interpret' is defined narrowly [in this context]—it means something more than 'consider,' 'refer to,' or 'apply.'" *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000). Merely "alleging a hypothetical connection between the claim and the terms of the CBA is not enough to preempt the claim," nor is "[a] creative linkage between the subject matter of the claim and the wording of a CBA provision." *Cramer*, 255 F.3d at 691–92. Moreover, preemption is warranted only where "the need to interpret the CBA . . . inhere[s] in the nature of the plaintiff's claim. If the claim is . . . based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." *Id*. at 691.

As we recently observed, the "*Burnside* factors reflect two driving concerns of preemption doctrine." *Kobold*, 832 F.3d at 1033. Mandating preemption when a purported state law claim is founded on a right grounded in a CBA prevents "parties' efforts to renege on their [CBA] arbitration promises by 'relabeling' as tort suits actions simply alleging

breaches of duties assumed in collective-bargaining agreements." *Livadas*, 512 U.S. at 123 (quoting *Lueck*, 471 U.S. at 211). By contrast, requiring preemption when a state law claim requires interpretation of a CBA serves a separate interest: preserving "a central tenet of federal labor-contract law . . . that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Lueck*, 471 U.S. at 220. Put differently, because of the pivotal role that an arbitrator plays in interpreting and administering CBAs, a court "can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements." *Lingle*, 486 U.S. at 411.

Because the second step of the *Burnside* test is centrally concerned with safeguarding the role of the contractual grievance/arbitration system, "there is no basis for scuttling the state law cause of action if any necessary CBA interpretation can in some fashion be conducted via the appropriate grievance/arbitration forum." *Kobold*, 832 F.3d at 1033. As we explained in *Kobold*, "[t]o allow such scuttling disadvantages employees covered by CBAs, as they lose state law protections because of an embedded CBA issue possibly peripheral to their core cause of action. The interest in sending substantial CBA issues through grievance/arbitration does not justify creating this disadvantage unless the interest cannot be otherwise accommodated." *Id.*

Against this doctrinal backdrop we turn to the present case.

III.

The thrust of UPS's argument for preemption is that because Matson's hostile work environment claim focused in part on her allegation that UPS improperly gave "extra work" assignments to male employees with less seniority, that claim cannot be resolved without interpreting the term "extra work," as used in the CBA, to determine whether Matson was in fact entitled to the work she claimed. More specifically, UPS maintains that "to prove that particular work was improperly assigned because of her gender, Matson first had to establish that she, as opposed to other employees, was entitled to the work under the CBA." UPS's premise is wrong, for several reasons.

As an initial matter, we reject UPS's suggestion that Matson's claim is nothing more than a repackaged "contractual dispute" over the assignment of extra work. This assertion mischaracterizes her claim. Matson's claim included the allegation that UPS systematically assigned men work to which they were not entitled by seniority, but only as *one element* of a pervasively hostile work environment. The hostile environment, Matson maintained, was also characterized by intimidation and derision having nothing to do with work assignments. Matson's right not to work in a gender-based hostile work environment is a "nonnegotiable state-law right[] . . . independent of any right established by contract." *Lueck*, 471 U.S. at 213. The claim, therefore, is not preempted under the first *Burnside* factor, as it is not grounded in any right created by the CBA.

Nor does anything "in the nature of" Matson's hostile work environment claim require interpretation of the CBA. *Cramer*, 255 F.3d at 691. As the district court instructed,

"[t]o find for plaintiff, the jury had to find that 'there was conduct that occurred because of Ms. Matson's gender'; 'this conduct was unwelcome in the sense that Ms. Matson regarded the conduct as undesirable and offensive, and did not solicit or incite it'; 'this conduct was so offensive or pervasive that it altered the conditions of Ms. Matson's employment'; and 'management knew . . . of this conduct, and UPS failed to take reasonably prompt and adequate corrective action reasonably designed to end it.'" As these elements illustrate, the focus of inquiry in a hostile work environment case is properly on the *actual workplace treatment* of the plaintiff and the actual practice of the management in responding—or contributing—to that treatment. UPS's alleged discrimination in assigning extra work was just one of several factors that Matson contends contributed to a hostile work environment. The multi-factor, fact-based inquiry required to decide Matson's hostile environment claim could be conducted without interpreting any provision of the CBA.

Even were we to grant that Matson's hostile environment claim rested on the allegedly discriminatory assignment of certain work assignments to men, and, further, that whether the CBA gave Matson a seniority-based *right* to that work requires interpretation of the CBA, Matson's hostile work environment claim still would not require interpretation of any contractual provision.

We note, first, that the only CBA provision that uses the term "extra work" applies to "[i]nside employees," and so does not apply to the deliveries here in dispute. In using the term "extra work," with regard to outside deliveries, Matson was not relying on that provision. Instead, she was more

colloquially referring to sporadic work not covered by pre-set assignments.

Matson could have a viable hostile environment claim whether or not the CBA actually *requires* assignment of that work based on seniority. Contrary to UPS's assumption, nothing in Matson's argument depends on her having been contractually entitled to the disputed work. Even if she did not have a *right* to the work under the CBA, management's systematic favoring of men in assigning the disputed work could contribute to a hostile work environment. The correct interpretation of the CBA, in other words, is purely peripheral to the relevant question with respect to assigning work. That question was whether UPS showed systematic favoritism toward men in making its work assignments, thereby contributing to a hostile work environment for Matson and other women.

Put differently, Matson's contention is not that UPS created a hostile work environment by violating her contractual seniority rights. Rather, her position is that failing to assign her the work despite her seniority is *evidence* of UPS's hostility toward her because of her gender. Matson's central contention was that she should have been awarded the disputed work on any of the usual rationales for work assignment—seniority, proximity to the location where the work was to begin, or temporal availability—and that all those usual criteria were disregarded.[5] As UPS did not assign the work on the basis of *any* of those criteria, Matson

---

[5] For example, one of Matson's female coworkers testified that both she and Matson were denied work assignments even though they were immediately available and even though they had greater seniority than the male employees who received the assignments.

maintained, hostility toward her because of her sex is the likely explanation for the failure to assign her the work.

Additionally, to the extent UPS chose to emphasize its interpretation of the CBA to dispute Matson's right to the work as part of its defense, that defense does not undermine Matson's reliance on the assignment of the disputed work as part of her hostile work environment claim. For one thing, "§ 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." *Cramer*, 255 F.3d at 691. For another, UPS does not put forward any interpretation of the CBA under which it was *required* to award the work as it did. At best, the company's contention is that nothing in the CBA required that the work be awarded to Matson. Whether that is so or not does not detract from Matson's statutory gender-based hostile work environment claim. An employer who is free to make job assignments as it chooses can still violate the state law proscription on creating a gender-based hostile work environment by, among other things, favoring men over women when assigning work.

Further, even if any interpretation of the CBA had been required, the relevant interpretive issues were addressed in formal settlements after invocation of the grievance procedure. For example, following one of Matson's grievances, the parties reached a settlement according to which UPS agreed that "[t]he Company will recognize that the principles of seniority be given prime consideration in the assigning of extra work to unassigned geographic delivery areas of the combination air delivery drivers dispatched out of the [Boeing Field International] facility." The record includes fifteen other grievances filed by Matson. Of these, seven were ultimately withdrawn. Three were resolved when

UPS agreed to compensate Matson for lost work. One was settled when UPS agreed to "use by seniority Monday through Friday air drivers for the Saturday air shuttles when needed." Four were settled when UPS agreed to "abide by" or "consider" Matson's seniority in the "day to day dispatching of [early morning] routes."

One could view these agreements as agreed-upon CBA interpretations on the very issue that UPS contends remains disputed: that work Matson complained about was supposed to be assigned in accord with seniority principles. Or one could view them as independent labor-management agreements, which would also be covered by § 301 of the LMRA. *See Retail Clerks Int'l. Ass'n, Local Union Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962). Either way, the clarity of the agreements means that no further interpretation was required; the grievance settlements need only be looked to or applied. *See Burnside*, 491 F.3d at 1060; *Balcorta*, 208 F.3d at 1108. Finally, the grievance settlements were, at the very least, evidence that seniority was as a practical matter a factor usually used in making work assignments in the workplace.

However the settlements are viewed, the jury was not asked to interpret the CBA differently from the representations UPS made when settling Matson's grievances, and nothing in the elements of the hostile work environment claim required it to do so. As we recognized in *Kobold*, "there is no basis for scuttling the state law cause of action if any necessary CBA interpretation can . . . be conducted via the appropriate grievance/arbitration forum." 832 F.3d at 1033. Here, use of that forum resulted in resolutions consistent with Matson's partial reliance on work

assignment patterns to support her hostile work environment claim.

Finally, contrary to UPS's argument, *Perugini v. Safeway Stores, Inc.*, 935 F.2d 1083 (9th Cir. 1991) does not control the result here. In *Perugini*, the plaintiff charged her employer with intentional infliction of emotional distress ("IIED") in part based on its refusal to assign her to light duty while she was pregnant. To establish her IIED claim, Perugini had to show that Safeway's conduct was "extreme and outrageous." *Id.* at 1087. This court concluded that, "if Safeway's managerial freedom is not constrained in any material way by the CBA, a rational jury could not find that Safeway's conduct in discharging Perugini from heavy work instead of reassigning her to light work" met this standard. *Id.* at 1088. Therefore, the court concluded, it was required to "look to the CBA to judge the appropriateness of Safeway's behavior in regard to this allegation." *Id.*

By contrast, here, even if UPS's "managerial freedom is not constrained in any material way by the CBA"—i.e., if Matson had no contractual right to the disputed work assignments—for the company consistently to assign the work to men rather than to equally eligible, or more eligible, women was evidence of a gender-based hostile environment. Matson's gender-based hostile work environment claim was thus viable even if UPS had complete "managerial freedom" over the assignment of the disputed work under the CBA.

Notably, the IIED preemption analysis in *Perugini* did not concern a sex discrimination or hostile work environment

claim.[6] If it had, then the existence of employer discretion under the CBA would not have been dispositive, or even pertinent; discriminatory exercise of that discretion would still be actionable.

IV.

For all these reasons, the "adjudication of [Matson's] claim [does not] require interpretation of a provision of the CBA," and § 301 preemption is not warranted. *Cramer*, 255 F.3d at 691–92.

*Kobold* noted that "although § 301 preemption questions arise fairly frequently, '[f]amiliarity . . . has not bred facility.'" 832 F.3d at 1032 (alterations in original) (quoting *Cramer*, 255 F.3d at 689). This case illustrates the pitfalls of expanding the preemptive effect of the federal common law governing the interpretation of collective bargaining agreements to limit the enforcement of state law employment discrimination protections. Litigation concerning such protections ordinarily focuses on adverse workplace incidents, probing into whether discriminatory motives underlay those incidents. As the focus is not only on what happened but why it happened, resolving such litigation will rarely rest on rights created by CBAs or require interpreting CBAs in the sense required for § 301 preemption.

---

[6] Perugini did allege emotional distress caused by "on-the-job harassment" based on her sex, as well as the refusal to assign her light work. *Perugini*, 935 F.2d at 1088. We held that the emotional distress claims premised on her employer's alleged sex-based harassment were *not* preempted. *Id.* at 1088–89.

In this instance, however "muddy" the CBA was concerning the assignment of the disputed work, the questions for the jury—to the extent it considered the assignment issue at all—were not whether the disputed assignments were "extra work" as the term is used in the CBA, or whether the CBA required that they be awarded by seniority. Rather, the jury's focus was directed to whether the assignments were discriminatory in that men were systematically favored over similarly situated women. Making that determination did not require the jury to decide what any provision of the CBA requires. And the jury had the resolutions of Matson's grievances as evidence that, in fact, seniority was usually or often considered.

We therefore reverse the decision of the district court that Matson's claims were preempted to the extent they relied on her allegations regarding UPS's extra work assignments, and we reinstate the jury verdict from the first trial. Because the district court's conclusion that the jury's damages award was "grossly excessive" rested in part on its erroneous preemption ruling, we reverse that determination as well, and remand for reconsideration of the damages question.

**REVERSED AND REMANDED.**