**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN KOBOLD,
            *Plaintiff-Appellant*,

v.

GOOD SAMARITAN REGIONAL
MEDICAL CENTER,
            *Defendant-Appellee.*

No. 13-35528

D.C. No.
6:12-cv-02082-TC

Appeal from the United States District Court
for the District of Oregon
Thomas M. Coffin, Magistrate Judge, Presiding

| | |
|---|---|
| LARRY BARR; ANTHONY BARTON; STEPHEN BUSCH; BRIAN CARLSON; PETER DENNIS; DAN DORR; CLARK GOBLE; WARREN MARTIN; BILLY PIERCE; JESSE ROBINSON; DAVID SHATTO; DOUGLAS TOELKES, *Plaintiffs-Appellants*, <br><br> v. <br><br> ROSS ISLAND SAND & GRAVEL CO., *Defendant-Third-Party-Plaintiff-Appellee*, <br><br> v. <br><br> OREGON TEAMSTERS EMPLOYERS TRUST; GENERAL TEAMSTERS LOCAL UNION NO. 162, *Third-Party-Defendant.* | No. 13-35590 <br><br> D.C. No. 3:12-cv-00683-MO |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

ONA C. ALLEN,
                  *Plaintiff-Appellant*,

                    v.

NORTHWEST PERMANENTE, P.C.,
an Oregon corporation,
                  *Defendant-Appellee.*

No. 13-35265

D.C. No.
3:12-cv-00402-ST

OPINION

Appeal from the United States District Court
for the District of Oregon
Janice M. Stewart, Magistrate Judge, Presiding

Argued and Submitted November 6, 2015
Portland, Oregon

Filed August 9, 2016

Before: Marsha S. Berzon and Paul J. Watford, Circuit
Judges, and James Alan Soto,[*] District Judge.

Opinion by Judge Berzon

---

  [*] The Honorable James Alan Soto, District Judge for the U.S. District
Court for the District of Arizona, sitting by designation.

**SUMMARY**[**]

**Labor Law**

The panel ordered consolidated three appeals involving employees represented by labor unions who sought remedies under state law against their employers; affirmed the district court's grant of summary judgment to the employer in the first appeal; affirmed in part and reversed and remanded in part in the second appeal; and affirmed in the third appeal.

In all three cases, there was a collective bargaining agreement ("CBA") between the union and the employer setting out a grievance and arbitration procedure to govern disputes arising under the agreement. And in all three, a grievance was filed but did not provide full relief, prompting the employee to turn to the courts. All the employees initially filed their cases in state court, but the cases were removed to federal court on the basis of preemption under § 301 of the Labor Management Relations Act. In all the cases, the district court denied a motion to remand and held the state law claims preempted.

A state law claim is preempted if it either involves a right conferred upon an employee solely by virtue of a CBA or is substantially dependent on analysis of a CBA.

In the first case, the panel held that assuming Or. Rev. Stat. §§ 652.120 and 652.615 conferred upon a nurse the right to receive premium pay for extra shifts worked, that right was

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

substantially dependent on an analysis of the terms of a CBA in order to determine which shifts qualified for premium pay. Accordingly, the state law claims were preempted by § 301. The plaintiff could not pursue her claims under § 301 because she did not exhaust her remedies under the CBA and did not allege that her union breached its duty of fair representation. In the second case, the panel reversed in part, holding that claims for violation of Or. Rev. Stat. § 652.610(4) (establishing time limits regarding CBA-authorized paycheck deductions) and breach of fiduciary duty were not preempted. The panel affirmed as to a claim for money received. The panel concluded that § 652.610(4) conferred a right independent of the plaintiffs' rights under a CBA, and this right was not substantially dependent on analysis of the CBA. The breach of fiduciary duty claim also was not preempted, but the claim for money received was not independent of the CBA and therefore was preempted. The panel remanded for the district court to decide whether to exercise supplemental jurisdiction over the non-preempted claims.

In the third case, the panel affirmed the district court's denial of the plaintiff's motion to remand and its grant of summary judgment in favor of the defendant. The panel held that judicial estoppel did not bar the plaintiff, a nurse practitioner, from arguing for remand to state court on the ground that a CBA did not govern a credentialing decision because the contrary position had been taken by the plaintiff's union, not the plaintiff herself, during arbitration. The panel held that in light of the arbitrator's decision that the credentialing decision must be evaluated under the CBA, the plaintiff's claim for intentional interference with economic relations arose out of the CBA, and thus was preempted. Affirming the district court's summary judgment on a non-

preempted defamation claim, the panel held that the claim was time-barred.

## COUNSEL

Thomas K. Doyle (argued), Bennett, Hartman, Morris & Kaplan, Portland, Oregon, for Plaintiff-Appellant Susan Kobold.

Kirk Peterson (argued), Bullard Law, Portland, Oregon, for Defendant-Appellee Good Samaritan Regional Medical Center.

Elizabeth Farrell Oberlin (argued), Portland, Oregon; Benjamin Rosenthal, Portland, Oregon; for Plaintiffs-Appellants Larry Barr, et al.

Ankur H. Doshi (argued) and Kamyavathana Sivanesan, Portland, Oregon; Sheeba Suhaskumar, law student; Northwestern School of Law of Lewis & Clark College, Portland, Oregon; for Defendant-Third-Party-Plaintiff-Appellee Ross Island Sand & Gravel Co.

Matthew Caruso Ellis (argued), Portland, Oregon; George P. Fisher, Portland, Oregon; for Plaintiff-Appellant Ona C. Allen.

Chris Kitchel (argued), James N. Westwood, and Brenda K. Baumgart; Stoel Rives LLP, Portland, Oregon; for Defendant-Appellee Northwest Permanente, P.C.

**OPINION**

BERZON, Circuit Judge:

The three cases in this consolidated appeal—*Kobold v. Good Samaritan Regional Medical Center*, *Barr v. Ross Island Sand & Gravel Co.*, and *Allen v. Northwest Permanente*—involve different parties and facts, but are similar in important ways. All three involve employees represented by labor unions who seek remedies under state law against their employers. In all three, there is a collective bargaining agreement ("CBA") between the union and the employer setting out a grievance and arbitration procedure to govern disputes arising under the agreement. And in all three, a grievance was filed but did not provide full relief, prompting the employee to turn to the courts. All the employees initially filed their cases in state court, but the cases were removed to federal court on the basis of preemption under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). In all the cases, the district court denied a motion to remand and held the state law claims preempted. We consider the § 301 preemption questions on appeal.

As this court has observed more than once, although § 301 preemption questions arise fairly frequently, "[f]amiliarity . . . has not bred facility." *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (en banc) (alteration in original) (quoting *Galvez v. Kuhn*, 933 F.2d 773, 774 (9th Cir. 1991)). In the hope that doing so will illuminate the parameters of § 301 preemption analysis, and so help "[breed] facility," *id.*, we have consolidated the three cases for consideration and resolve them in this single

opinion. We begin with a review of § 301 preemption doctrine and then proceed to discuss each case.

## I. Section 301 Preemption

Section 301 of the LMRA states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a).

On its face, § 301 reads as a jurisdictional statute. But not long after its passage, the Supreme Court held, in *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 451 (1957), that § 301 is not simply jurisdictional. Instead, it should be "understood . . . as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985). "The Court subsequently held that this federal common law preempts the use of state contract law in CBA interpretation and enforcement." *Cramer*, 255 F.3d at 689 (citing *Local 174, Teamsters of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962)). "Once preempted, 'any claim purportedly based on [a] . . . state law is considered, from its inception, a federal claim, and therefore arises under federal law.'" *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007) (alteration in original) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987)).

In addition to promoting the development of a uniform federal labor law, § 301 preemption doctrine is designed "in large part to assure that agreements to arbitrate grievances would be enforced, regardless of the vagaries of state law and

lingering hostility toward extrajudicial dispute resolution." *Livadas v. Bradshaw*, 512 U.S. 107, 122 (1994). To give "the policies that animate § 301 . . . their proper range," the Supreme Court has expanded "the pre-emptive effect of § 301 . . . beyond suits alleging contract violations" to state law claims grounded in the provisions of a CBA or requiring interpretation of a CBA. *Lueck*, 471 U.S. at 210–11.

Critically, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301." *Id.* at 211. Drawing on Supreme Court precedent, this court has articulated a two-step inquiry to analyze § 301 preemption of state law claims. First, a court must determine "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted, and [the] analysis ends there." *Burnside*, 491 F.3d at 1059. If the court determines that the right underlying the plaintiff's state law claim(s) "exists independently of the CBA," it moves to the second step, asking whether the right "is nevertheless 'substantially dependent on analysis of a collective-bargaining agreement.'" *Id.* (quoting *Caterpillar*, 482 U.S. at 394). Where there is such substantial dependence, the state law claim is preempted by § 301.[1] If there is not, then the claim can proceed under state law. *Id.* at 1059–60.

To determine whether a right is independent of a CBA—the first *Burnside* factor—a court must focus its inquiry on "the *legal* character of a claim, as 'independent' of rights under the collective-bargaining agreement []and not

---

[1] We discuss later the consequences of a determination that a state law claim is preempted by § 301.

whether a grievance arising from 'precisely the same set of facts' could be pursued." *Livadas*, 512 U.S. at 123 (emphasis added) (internal citation omitted). Only if the claim is "founded directly on rights created by [a] collective-bargaining agreement[]" does § 301 preempt it. *Caterpillar*, 482 U.S. at 394.

The second *Burnside* factor—whether a plaintiff's state law right is "substantially dependent on analysis of [the CBA]," *Burnside*, 491 F.3d at 1059—turns on "whether the claim can be resolved by 'look[ing] to' versus interpreting the CBA. If the latter, the claim is preempted; if the former, it is not." *Id.* at 1060 (quoting *Livadas*, 512 U.S. at 125) (alteration in original). This court has previously "stressed that, in the context of § 301 complete preemption, the term 'interpret' is defined narrowly—it means something more than 'consider,' 'refer to,' or 'apply.'" *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000). And, notably, "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar*, 482 U.S. at 399. In other words, "[i]f the *claim* is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." *Cramer*, 255 F.3d at 691 (emphasis added).

The *Burnside* factors reflect two driving concerns of preemption doctrine: first, preventing "parties' efforts to renege on their arbitration promises by 'relabeling' as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements," *Livadas*, 512 U.S. at 123 (citation omitted), and second, preserving "a central tenet of federal labor-contract law . . . that it is the arbitrator, not the

court, who has the responsibility to interpret the labor contract in the first instance," *Lueck*, 471, U.S. at 220.

Notably, there is no basis for scuttling the state law cause of action if any necessary CBA interpretation can in some fashion be conducted via the appropriate grievance/arbitration forum. To allow such scuttling disadvantages employees covered by CBAs, as they lose state law protections because of an embedded CBA issue possibly peripheral to their core cause of action. The interest in sending substantial CBA issues through grievance/arbitration does not justify creating this disadvantage unless the interest cannot be otherwise accommodated. There are, accordingly, circumstances in which preemption can be avoided by accepting an arbitrator's interpretation of the CBA.[2] In some instances, for example, an arbitrator's interpretation of the CBA may determine whether an employee's otherwise independent state law claim

---

[2] For example, where a right arises independently under state law but may later require interpretation of the CBA to calculate damages, "the district court will be able to devise processes to preserve the preeminent role of the CBAs' dispute resolution processes to address the discrete dispute then arising." *Burnside*, 491 F.3d at 1074 n.19. Similarly, in "[some] circumstances a practice of deferring the litigation pending an arbitrator's resolution of the contract interpretation issues rather than extinguishing the claim might be appropriate." *Cramer*, 255 F.3d at 691 n.2; *see also Collyer Insulated Wire, A Gulf & Western Sys. Co.*, 192 N.L.R.B. 837 (1971) (holding that where there is an applicable arbitration clause, NLRB unfair labor practice cases involving interpretation of the CBAs shall be held in abeyance, and the parties must arbitrate the interpretation question before returning to the Board for adjudication of remaining legal and factual issues). Thus, where the claim cannot be resolved without interpreting the CBA, "[h]olding the plaintiff's cause of action substantively extinguished may not . . . always be the only means of vindicating the arbitrator's primacy as the bargained-for contract interpreter." *Livadas*, 512 U.S. at 124 n.18.

in fact asserts a right created by the CBA. *See* Section IV.C, *infra.*

Still, once a state law claim has been found substantially dependent upon analysis of a CBA under the second prong of *Burnside*, most often "that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Lueck*, 471 U.S. at 220 (internal citation omitted). Under a collective bargaining agreement like the ones in these cases, an employee usually cannot succeed in a suit under § 301 to vindicate personal contract-based rights unless the contractual grievance-arbitration procedure is invoked on her behalf or on behalf of a group of employees of which she is part. If the dispute is not ultimately resolved by an arbitration, the employee must establish that the union violated its duty of fair representation by failing to pursue the grievance to arbitration, or pursuing it arbitrarily. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991); *Vaca v. Sipes*, 386 U.S. 171, 190–91 (1967). And, where the remedies provided in the CBA have been exhausted, judicial review is extremely limited. *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *Sw. Reg'l Council of Carpenters v. Drywall Dynamics, Inc.*, 823 F.3d 524, 530 (9th Cir 2016) (noting that "courts reviewing labor arbitration awards afford a 'nearly unparalleled degree of deference' to the arbitrator's decision" (quoting *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1205 (9th Cir. 1989) (en banc))).

Against this doctrinal backdrop, we proceed to the specifics of each case.

## II. *Kobold v. Good Samaritan Regional Medical Center*

### A. *Factual and Procedural History*

Plaintiff-Appellant Sue Kobold worked as an operating room nurse for Defendant-Appellee Good Samaritan Regional Medical Center ("Good Samaritan") beginning in 1996. Nurses at Good Samaritan, including Kobold, are represented by a union, the Oregon Nurses Association ("ONA"). Their terms and conditions of employment are negotiated between Good Samaritan and ONA and spelled out in a collective bargaining agreement ("GS CBA").

The GS CBA provides that nurses who work extra shifts receive premium pay at one and one-half times the regular rate. In early 2010, Kobold learned that for more than one year Good Samaritan had not paid her the premium rate for extra shifts worked. It appears, although the record is not clear, that Kobold discovered the problem when the operating room manager informed her that Good Samaritan would only pay the regular rate, not the premium rate, to nurses who signed up to work a surgical technician's "orphan" shifts—that is, vacant shifts that cannot be covered by staff members within the same team. Kobold believed that nurses who signed up to work these orphan shifts should be paid the premium rate.

The GS CBA prescribes a mandatory five-step grievance and arbitration procedure for "[p]roblems arising in connection with the application or interpretation of the Agreement." ONA submitted a grievance regarding extra shift premium pay, and Good Samaritan agreed prospectively to change its practice and pay the premium rate for extra operating room shifts. Good Samaritan refused, however, to

issue retroactive pay for extra shifts already worked. It claimed that those shifts had been marked as regular pay in the electronic scheduling software, so the nurses knew the pay rate before signing up to work the shifts. After ONA requested arbitration, the union and Good Samaritan settled the grievance.

As part of the settlement, Good Samaritan paid Kobold $2,216.68, the equivalent of 45 days of premium pay. That payment was the full amount to which Kobold was entitled under the GS CBA, which authorizes grievances to be filed up to 45 days following the occurrence of the matter being grieved. Because Kobold believed she was entitled to more than 45 days of back pay, she filed an action in state court.

Kobold asserted two causes of action in her complaint. First, she alleged that Good Samaritan failed to pay all wages owed her at each pay period, in violation of Or. Rev. Stat. § 652.120. Or. Rev. Stat. § 652.120(1) requires that "[e]very employer shall establish and maintain a regular payday, at which date the employer shall pay all employees the wages due and owing to them." Second, she alleged that Good Samaritan unlawfully deducted from her paycheck amounts due and owing, in violation of Or. Rev. Stat. § 652.615. Or. Rev. Stat. § 652.615 creates a private right of action for a violation of § 652.610(3), which provides that "[a]n employer may not withhold, deduct or divert any portion of an employee's wages unless" an exception applies, one of which is that "[t]he deduction is authorized by a collective bargaining agreement to which the employer is a party." Or. Rev. Stat. § 652.610(3)(d). Kobold sought $24,000 in unpaid wages, as well as attorney's fees, costs, and disbursements.

After Kobold filed her state court suit, Good Samaritan filed a notice of removal, alleging that Kobold's state law claims are preempted by § 301 of the LMRA. On the same ground, Good Samaritan filed in federal court a motion to dismiss or, in the alternative, a motion for summary judgment. The magistrate judge determined that Kobold's state law claims were preempted under § 301. He then concluded that because Kobold failed to allege and could not prove that she had exhausted her contractual remedies, and also did not allege that ONA had breached its duty of fair representation, she could not succeed on a claim under § 301. He thus recommended that Good Samaritan's motion for summary judgment be granted. The district court adopted the magistrate's findings and recommendation, granted Good Samaritan's motion for summary judgment, and dismissed the case. We affirm.

## B.  Kobold's State Law Claims Are Preempted by § 301

Assuming without deciding that ORS § 652.120 and § 652.615 independently confer upon Kobold the right to receive premium pay for extra shifts worked, that right is substantially dependent on an analysis of the terms of the GS CBA. Before a court could calculate the total *amount* Kobold is owed, it must determine which of the shifts she worked qualified for premium pay. The Oregon statutes under which Kobold seeks relief provide only that an employee be paid "the wages due and owing to them." Or. Rev. Stat. § 652.120(1). They do not provide any means with which to assess *whether* wages are "due and owing." To answer that question, a court must consult the GS CBA. In this case, because of a particular provision of the GS CBA that is in dispute, a court must interpret, not just refer to or look at, the GS CBA. *See Burnside*, 491 F.3d at 1060.

The GS CBA provides that nurses are to be paid one and one-half times their regular pay rate for all hours worked above their regularly scheduled full-time equivalent shifts "except when there is a change of schedule agreed upon by the Medical Center and nurse."[3] Thus, for Kobold to succeed on her state law claim that she was not paid the premium rate for extra shifts, a court must determine whether Kobold and Good Samaritan agreed to a change of schedule.

Whether or not there was an agreed upon change of schedule is exactly what is in dispute between the parties. Good Samaritan argues that Kobold is not entitled to premium pay because she agreed to work the extra shifts "despite conspicuous notice that the shifts would be paid at a regular rate." Kobold contends that this reading of the agreement exception "would undermine the purpose of the extra shift premium and mean that Defendant would never pay extra shift premium."

The GS CBA does not directly and clearly explain what constitutes a "change of schedule," nor how an agreement between Good Samaritan and a nurse is to be made. The settlement agreement between Good Samaritan and ONA, through which Kobold was paid 45 days of premium pay wages, is of no help in resolving this dispute, because the record does not contain a copy of the agreement or an explanation of how the total amount paid to Kobold was calculated. At best, all the settlement demonstrates is that once the total number of extra shifts worked without agreement to a change of schedule is known, it is simple to calculate the amount of premium pay owed. But the

---

[3] We refer to this provision of the GS CBA as the "agreement exception."

settlement, as far as the record reveals, did not shed any light on how to determine *which* shifts qualify for premium pay.

Ultimately, then, a court must interpret the meaning of the agreement exception to resolve Kobold's state law claims, without any illumination from the parties' agreements or from an arbitrator chosen by the parties to interpret the GS CBA. Because the state law claims substantially depend on an interpretation of the GS CBA, Kobold's state law claims are to that degree preempted by § 301.

## C. *Kobold Cannot Pursue Her Claims Under § 301*

As we have noted, the conclusion that § 301 precludes adjudication of a state law claim in whole or part does not automatically require dismissal of a union-represented employee's challenge of an employer's actions. Here, for example, Kobold could maintain her claim if she can demonstrate that her remedies under the GS CBA were exhausted or can yet be exhausted, *see* Part I, *supra*, or that her union breached its duty of fair representation in failing to do so, and if this court then determines that litigation of her state cause of action remains available. Kobold cannot so demonstrate.

The mandatory grievance procedure outlined in the GS CBA, which ends with binding arbitration, was never exhausted regarding premium pay for extra shifts worked outside the 45-day period covered by the settlement. And Kobold has not alleged that ONA breached its duty of fair representation in agreeing to a settlement covering only 45 days instead of further pursuing the grievance. Because Kobold cannot prove that her contractual remedies were exhausted, and does not allege that ONA breached its duty of

fair representation, she cannot pursue any alleged GS CBA violation.

## III. *Barr v. Ross Island Sand & Gravel Co.*

### A.  Factual and Procedural History

Plaintiffs-Appellants (collectively referred to as "Barr") are or formerly were truck drivers employed by Defendant-Appellee Ross Island Sand & Gravel Co. ("RISG"). Barr is represented by General Teamsters Local Union No. 162 ("Teamsters"). In 2008, Teamsters and RISG agreed to a two-year collective bargaining agreement ("RISG CBA").

The RISG CBA provided that RISG and Barr would each contribute to the cost of Barr's health and welfare benefits. RISG was to pay 90% of the cost of benefits, and would deduct the other 10% from employees' paychecks. RISG was to remit its contributions and the employees' paycheck deductions to the Oregon Teamsters Employers Trust Fund ("OTET"), which managed the health insurance plan. The RISG CBA also set out a mandatory multi-step grievance procedure culminating in arbitration. The grievance procedure was to be "the sole method of resolving disputes during the life of [the RISG CBA]."

In 2010, RISG "failed to timely provide premium payments to OTET." Teamsters filed a class action grievance in May 2010, which RISG resolved by making the necessary payments.

The 2008 RISG CBA expired at the end of December, but Teamsters and RISG maintained it until November 2011 while they negotiated a new collective bargaining agreement.

During that time, RISG allegedly again failed to make contributions to OTET, causing Barr's health insurance benefits to lapse. RISG and Teamsters ratified a new RISG CBA in November 2011, which ran retroactively from the beginning of 2011 through the end of 2014. The new RISG CBA retained the same 90/10 contribution to OTET for employee health benefits and the same grievance procedure.

Barr filed suit in state court, alleging that RISG had, since April 2011, deducted funds from their paychecks but failed to remit the funds to OTET, causing Barr to lose his health benefits. Barr's complaint pleaded three state law claims: violations of Or. Rev. Stat. § 652.610(3), breach of fiduciary duty, and money had and received. Barr sought unpaid wages; medical expenses sustained as a result of not having health benefits; emotional distress damages; and pre-judgment interest. RISG filed a notice of removal on the basis, *inter alia*, that Barr's claims were preempted by § 301 of the LMRA; Barr filed a motion to remand, but the district court denied it, reasoning that the question of *when* RISG was required to remit the paycheck deductions to OTET required interpretation of the RISG CBA.

After Barr filed his complaint but before the district court denied his motion to remand, Teamsters and RISG continued to negotiate the deductions issue. During that period, Teamsters filed a grievance on behalf of Barr individually (as opposed to the group of plaintiffs we refer to throughout as Barr), alleging that RISG had not kept his health benefits current and requesting that RISG pay the premiums owed. Teamsters later instituted a class grievance covering all employees who had lost OTET coverage because of RISG's failure to make the monthly payments, and settled that grievance.

Eventually, RISG and Teamsters negotiated settlements and resolved the outstanding grievances. Under the terms of the settlement, RISG agreed to pay the past due health insurance premiums. Because the settlement did not fully compensate Barr for his economic damages, non-economic injuries, attorney's fees and costs, or potential punitive damages, he maintained his lawsuit.

RISG moved for summary judgment. In Barr's memorandum in opposition, he argued that RISG's failure to remit the paycheck deductions to OTET was a violation of Or. Rev. Stat. § 652.610(4). Barr had not previously specifically mentioned Or. Rev. Stat. § 652.610(4); his complaint referred to § 652.610(3). Under Or. Rev. Stat. § 652.610(3)(d), "[a]n employer may not withhold, deduct or divert any portion of an employee's wages unless . . . [t]he deduction is authorized by a collective bargaining agreement to which the employer is a party." Or. Rev. Stat. § 652.610(4) establishes time limits regarding CBA-authorized deductions. It provides:

> When an employer deducts an amount from an employee's wages as required or authorized by law or agreement, the employer shall pay the amount deducted to the appropriate recipient as required by the law or agreement. The employer shall pay the amount deducted within the time required by the law or the agreement or, if the time for payment is not specified by the law or agreement, within seven days after the date the wages from which the deductions are made are due. Failure to pay the amount as required constitutes an unlawful deduction.

*Id.* In his opposition to summary judgment, Barr argued that although the deductions were authorized by the RISG CBA, they became unlawful pursuant to § 652.610(4) when RISG failed to pay the deductions to OTET within seven days.

The district court held that Barr's state law claims were preempted under § 301 of the LMRA because the dispute could not be resolved without "referencing the CBA and related principles." On the ground that the RISG CBA's grievance and arbitration procedure was not exhausted, the district court granted RISG's motion for summary judgment and dismissed the case with prejudice. Barr timely appealed. We reverse as to preemption of Plaintiffs' § 652.610(4) and breach of fiduciary duty claims, but affirm as to the money had and received claim.

## B.  Barr's Or. Rev. Stat. § 652.610(4) Claim

Although Barr did not mention § 652.610(4) in his complaint as a ground for relief, we shall consider Barr's argument. "[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Here, Or. Rev. Stat. § 652.610(4) is not so much a new claim as a more precise and accurate framing of Barr's original allegation. Or. Rev. Stat. §§ 652.610(3) and (4) work in tandem: section 652.610(3) permits an employer to deduct a portion of an employee's wages if authorized to do so by a CBA, and § 652.610(4) makes such deductions unlawful if the funds are not properly paid within the time specified by the CBA or, if the CBA is silent, within the statutorily-supplied seven-day time period. The interaction between the two provisions of § 652.610 is key to Barr's suit. As Barr argues, "such allegation is so strongly suggested by the facts

that only an unreasonable defendant would fail to make the connection."[4]

Having concluded that we may evaluate Barr's § 652.610(4) argument, we reject RISG's request that we certify to the Oregon Supreme Court the question whether § 652.610(4) creates a private right of action. Whether a statute grants a private right of action is not a jurisdictional question. *See Verizon Md.*, *Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002). Nor is deciding the private right of action question an essential prerequisite to conducting a § 301 preemption inquiry. The preemption analysis is concerned with whether a claim is properly pursued under state or federal law. If federal law, then the

---

[4] Even if the § 652.610(4) reliance were seen as a separate claim, "[t]he district court should have construed [the matter raised in opposition to the motion for summary judgment] as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time." *Desertrain v. City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014) (quoting *Apache Survival Coal v. United States*, 21 F.3d 895, 910 (9th Cir. 1994)).

Had it done so, the pertinent factors should have counseled the district court to grant leave to amend. *See id.* There is no evidence of bad faith. Raising § 652.610(4) at the summary judgment stage did not cause RISG to seek additional discovery nor did it cause any delays. RISG was already on notice from the complaint that Barr's claims stemmed from RISG's failure timely to remit the paycheck deductions to OTET. The district court also discussed the timeliness issue with counsel at several points during oral argument on Barr's motion to remand. And RISG had full opportunity to argue that the § 652.610(4) claim could not succeed as a matter of law; it did so in its reply brief on its motion for summary judgment. As *Desertrain* held, a claim of prejudice is unpersuasive where defendants fully argued an issue in the summary judgment briefing. 754 F.3d at 1155. Finally, as we later discuss, considering Or. Rev. Stat. § 652.610(4) would not be futile. And Barr did not otherwise amend his complaint.

claim would proceed in accord with § 301, and it would not matter whether the state statute provides a private cause of action. That issue arises, in other words, only if RISG's preemption contention fails. As the parties have thus far litigated only the preemption question, consideration of the state law private cause of action theory is premature—and, indeed, the issue may be litigated in state rather than federal court. *See* Section III.D, *infra*.

Having settled these predicate issues, we proceed to the merits of the § 301 preemption issue.

On the first *Burnside* factor, *Livadas* is closely analogous to this case and confirms that § 652.610(4) confers a right independent of Barr's rights under the RISG CBA. *Livadas* dealt with a California statute that, like Or. Rev. Stat. § 652.610(4), governs an employer's failure properly to remit employee payment in a timely manner.[5] 512 U.S. at 111. And, as in this case, the terms and conditions of the plaintiff's employment were subject to a CBA. *Id.* at 110.

When Livadas was discharged, she demanded that her employer immediately pay the wages owed her, and, when there was a delay in payment, the prescribed statutory penalty.[6] *Id.* at 111. When no penalty was paid, Livadas sued

---

[5] Cal. Lab. Code § 201 provides: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." *Livadas*, 512 U.S. at 111 n.3.

[6] Cal. Lab. Code § 203 provides that when an employer "willfully fails" to comply with § 201, "the wages of such employees shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but such wages shall not continue for more than 30 days." *Livadas*, 512 U.S. at 112 n.4.

under the state statute. The Supreme Court held Livadas' state law claim not preempted under § 301 of the LMRA, because "the primary text for deciding whether Livadas was entitled to a penalty was not the [CBA], but a calendar." *Id.* at 124. The only question that needed to be decided was "whether [the employer] 'willfully fail[ed] to pay' [Livadas's] wages promptly upon severance"—"a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer." *Id.* at 124–25 (quoting Cal. Lab. Code § 203).

This case is similar to *Livadas* in all pertinent respects. Barr alleges RISG violated Or. Rev. Stat. § 652.610(4) when it failed to remit the paycheck deductions to OTET for payment of Barr's health insurance premiums. Article 11 of the 2008 and 2011 RISG CBAs provides that the employees' health insurance premiums are monthly premiums and that RISG "agrees to make the appropriate monthly contribution" to OTET. But the RISG CBA does not provide a specific due date each month for transmitting such payments. Section 652.610(4) fills that gap by requiring that where the pertinent employment contract is silent as to when deductions must be remitted, the employer pay the amount deducted within seven days of the date wages are due. As in *Livadas*, then, the primary text for determining whether RISG violated § 652.610(4) is a calendar, not the RISG CBA. Barr's claim therefore is independent of his rights under the RISG CBA.

At the second step of the § 301 preemption inquiry, we must determine whether Barr's state law right to payment within seven days is "substantially dependent on analysis of [the RISG CBA]." *Burnside*, 491 F.3d at 1059 (internal quotation marks omitted). It is not.

RISG argues that an evaluation of Barr's claim requires this court to "interpret several key provisions of the contract." Specifically, RISG lists seven issues that would allegedly require interpretation:

> RISG's obligations to make any deductions from employee's paychecks; the amount and frequency of deductions taken; increases in monthly premium changes; coverage requirements of employees; RISG's obligations to return deductions upon remittance to OTET; RISG's obligations to pay out of pocket medical expenses as alleged in the Complaint; and the governing effect of the subscription agreements that controlled coverage of the Plaintiffs' health and welfare benefits under OTET and their relation to the 2008 CBA and 2011 CBA.

None of these matters require CBA interpretation. The 2008 and 2011 RISG CBAs unambiguously specify: RISG's obligation to deduct funds from Barr's paychecks; the amount and frequency of the deductions; to whom the deduction must be remitted and for what purpose; and the terms of employee eligibility for the health benefits. The RISG CBA does not address whether RISG is obligated to return deductions it ultimately remitted to OTET or to pay out-of-pocket medical expenses incurred when Barr's health insurance lapsed. Rather, these are pure statutory questions concerning the remedies available under Or. Rev. Stat. § 652.610(4). As to these issues as well, then, there is nothing in the RISG CBA to interpet. Barr's § 652.610(4) claim thus is not § 301 preempted under the second prong of the *Burnside* analysis either.

## C. Barr's Breach of Fiduciary Duty Claim

Barr alleges that RISG's obligations as a fiduciary arise under Or. Rev. Stat. §§ 652.710 and/or 652.720.[7] Or. Rev. Stat. § 652.710(1) provides that "[a]ll moneys collected by an employer from employees or retained from their wages . . . pursuant to a contract are trust funds and shall be placed and kept in separate accounts by the employer and shall promptly be paid over to the contractor." And § 652.720(1) provides that "[n]o employer shall retain, directly or indirectly, from employees or from their wages any part of the money collected or retained under Or. Rev. Stat. 652.710 for use or benefit of the employer." These statutory provisions create and impose duties on an employer independent of a CBA. *See Burnside*, 491 F.3d at 1059. Enforcing those duties does not substantially depend on interpreting the RISG CBA. A court need only determine whether RISG kept the health insurance funds in a separate account, promptly turned them over, and did not keep them for its own use or benefit; such a determination does not require a court to do any more than look at or refer to the RISG CBA, if that. *See Balcorta*, 208 F.3d at 1108. Barr's breach of fiduciary duty claim thus is not preempted.[8]

---

[7] In his complaint, Barr alleged that RISG's fiduciary obligations "arose under one or more of the following statutory provisions": Or. Rev. Stat. §§ 652.610, 652.710, and 652.720. Because we conclude that the latter two provisions create duties independent of the RISG CBA and are not substantially dependent on the RISG CBA, we do not also consider the first provision, which, in relevant part, permits an employer to deduct a portion of an employee's wages as authorized by a CBA. § 652.610(3)(d).

[8] Whether Or. Rev. Stat. §§ 652.710 and 652.720 actually *are* fiduciary duties is a matter of state law, which we do not address, as the question is not before us.

*D.  Barr's Money Had and Received Claim*

Barr's money had and received claim, however, *is* preempted. A money had and received claim is rooted in "the equitable principle that one who has been unjustly enriched by another should be required to make restitution. The action may be maintained whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other." *Briggs v. Lamvik*, 242 Or. App. 132, 143 (2011) (internal citation and quotation marks omitted). Oregon courts have declared that such a claim is "based on a contract implied in law." *Williamson v. Gov't Emps. Ins. Co.*, 247 Or. App. 48, 53 (2011).

Here, RISG's authority to deduct funds from Barr's paychecks and Barr's right to have those funds applied toward his health insurance premiums are purely contractual entitlements. Without those provisions in the RISG CBA, Barr would have no basis upon which to bring the money had and received claim. "State law does not exist as an independent source of private rights to enforce collective bargaining contracts." *Caterpillar*, 482 U.S. at 394 (quoting *Avco Corp. v. Machinists*, 376 F.2d. 337, 340 (6th Cir. 1967), *aff'd*, 390 U.S. 557 (1968)). Because Barr's money had and received claim is not independent of the RISG CBA, it is preempted under § 301.

The 2008 and 2011 RISG CBAs set out a mandatory and exclusive grievance procedure for resolving disputes "concerning the meaning, violation, and/or interpretation of the Agreement." The multi-step grievance procedure culminates in arbitration. Barr therefore can only maintain a claim under § 301 if he can demonstrate that his remedies

under the RISG CBA were exhausted.**[9]** The Teamsters settled or abandoned all grievances related to RISG's failure to remit paycheck deductions to OTET; the grievances were never submitted to an arbitrator.**[10]** Because the contractual remedies were not exhausted, and Barr does not allege that Teamsters breached its duty of fair representation, he cannot pursue his money had and received claim as a § 301 claim.

All three of Barr's claims "have 'a common nucleus of operative fact.'" *Osborn v. Haley*, 549 U.S. 225, 245 (2007) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)); *see* 28 U.S.C. § 1367(a). The district court therefore should decide on remand whether to exercise supplemental jurisdiction over Barr's Or. Rev. Stat. § 652.610(4) and breach of fiduciary duty claims.**[11]**

---

**[9]** Barr does not allege that Teamsters breached its duty of fair representation.

**[10]** Barr's counsel agreed during oral arguments on RISG's motion for summary judgment that the RISG CBA grievance and arbitration procedures had not been exhausted; Barr does not argue otherwise on appeal.

**[11]** Before the district court addresses whether to exercise supplemental jurisdiction, it should more fully consider whether the claims are completely preempted by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and raise a federal issue for that reason. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). RISG raised complete ERISA preemption as an affirmative defense in its answer to Plaintiffs' complaint, and the parties addressed ERISA preemption in their memoranda on Plaintiffs' motion to remand to state court. The district court rejected RISG's ERISA preemption argument without explanation.

## IV. *Allen v. Northwest Permanente*

### A.  *Factual and Procedural History*

Plaintiff-Appellant Ona Allen is a nurse practitioner formerly employed by Kaiser Foundation Health Plan of the Northwest ("HP"). The terms and conditions of Allen's employment were subject to a collective bargaining agreement ("Nurses' CBA") negotiated between HP and Allen's union, the Oregon Federation of Nurses and Health Professionals ("Nurses Union"). Defendant-Appellee Northwest Permanente, P.C. ("NWP"), is an association of physicians. HP and NWP are separate entities but both, as well as a third organization, Kaiser Foundation Hospitals ("KFH"), operate under the umbrella of their parent organization, Kaiser Permanente Northwest ("KPNW").

Allen was required, as a condition of her employment, to be re-credentialed every two years. The credentialing process involves review of an employee's work performance by the KPNW Credentials Committee, made up of representatives of HP, KFH, and NWP. According to KPNW's Credentialing & Recredentialing Manual ("the Manual"), the Credentials Committee "is a sub-committee of the NWP" board of directors; HP "designate[s] the KPNW Credentials Committee to make recommendations regarding credentialing decisions." An individual practitioner "may not provide care to KPNW members until the Credentials Committee makes a final decision to recommend the applicant." HP, KFH, and NWP thus "each have a separate responsibility and accountability to credential practitioners who are employed or contracted to treat members" based upon the recommendations of the Committee.

The Manual provides that "[w]hen quality of care/service issues arise, KPNW may initiate disciplinary action and/or reduce, suspend, or terminate privileges or staff status." While the Nurses' CBA covering Allen's terms and conditions of employment is silent regarding the credentialing requirement or procedures, the Manual indicates that HP "Union Staff," including nurse practitioners such as Allen, may appeal disciplinary actions based on credentialing decisions through the grievance procedure detailed in the Nurses' CBA.

In July 2008, Allen submitted to the Credentials Committee an application for the renewal of her credentials. The Credentials Committee conferred regarding Allen's application and concluded that she needed to be placed on a Work Improvement Plan ("WIP") as a result of certain low performance scores and multiple patient complaints.

Allen was on approved personal leave in New York when she learned from an HP supervisor that the Credentials Committee was requiring her to agree to a WIP as a condition for recredentialing. At the time, Allen "told [the supervisor] she was confused about why a WIP was necessary" and believed the plan would violate her collective bargaining rights. According to Allen, she was told that she was being "uncooperative" and received no further explanation.

Several weeks later, the Credentials Committee met again to discuss Allen's application for recredentialing. At that meeting, HP's Primary Care Director explained that Allen had neither signed nor responded to the WIP prepared for her. The Committee also discussed "several complaints from patients" regarding Allen's care. At the conclusion of the meeting, "[t]he committee recommended termination of Ms.

Allen's credentialing based on patient safety concerns because of repeated instances of not examining patients." The next day, HP placed Allen on unpaid administrative leave, because, without credentials, she was unable to care for patients.

Allen was notified of the Credentials Committee's negative decision by a letter, which notified her that she was "entitled to appeal the Committee's determination, in accordance with the terms of the KFHP Labor Contracts-[Nurses Union] Agreement, Article 11, Grievance Procedure."[12] In accord with this advice, Allen's union filed a grievance on her behalf, and pursued it to binding arbitration.

At arbitration, the parties stipulated that "the grievance is arbitrable and includes an appeal of the Credentials Committee's adverse recommendation pursuant to Credentialing Policy No. 26." The primary disputed issue was whether the Nurses' CBA's provision that "corrective action shall be for just cause only" applied to the Committee's decision.

Addressing that issue, the arbitrator in his opinion first explained that "[r]esolving the issues presented entails an examination of the power of the Credentials Committee and the nature of its action" denying Allen's application. After observing that the Manual indicates that HP is responsible for credentialing its own staff and that the Credentials Committee merely "formulates recommendations to" HP, the arbitrator noted that HP nonetheless "regarded the Credentials

---

[12] The reference to Article 11 is an error; the grievance procedure is actually found in Article 19 of the Nurses' CBA.

Committee's action as a denial" rather than a recommendation. Both parties, moreover, "seem[ed] to agree that the grievant's credentials were terminated by the Credentials Committee," even though such a termination would appear to exceed the jurisdiction of the Committee. Given that agreement, and because HP's Board of Directors made "no further determination," the arbitrator concluded, the Credentials Committee's action "should be treated as a final decision denying the grievant's application for recredentialing."

The arbitrator went on to rule that the Nurses' CBA's "just cause" standard was applicable. HP had "effectively fired the grievant," and "[i]nsofar as the Credentials Committee's decision was the foundation of the Employer's discharge of the grievant, it must be reviewed, to some degree, under the just cause standard."

Finally, the arbitrator ruled that the Credentials Committee's actions violated the just cause standard. He concluded that Allen's failure to cooperate with the Credentials Committee was "excusable because she was on vacation." Rather than denying Allen's application outright, the Credentials Committee "should have recommended a short term extension of the grievant's credentials," which would have allowed the parties to address the "legitimate, albeit debatable, concerns" raised by the committee. Because of this shortcoming, Allen's discharge was not for just cause. Having so concluded, the arbitrator vacated the Committee's decision, remanded Allen's credentialing application for further proceedings by the Committee, and placed Allen on

paid administrative leave for 60 days, but declined to award back pay.[13]

Unhappy with the arbitration award, Allen sued in state court, naming NWP as the defendant and alleging state law claims, including intentional interference with economic relations/contract; defamation; breach of contract; and breach of the duty of good faith. NWP removed the case to federal court, arguing that the court had original jurisdiction under 28 U.S.C. § 1331 because Allen's claims "arise under, and require interpretation of" her CBA, and were thus preempted by § 301 of the LMRA. In response, Allen filed a motion to remand, contending that NWP's credentialing process was not governed by the Nurses' CBA and that none of her claims required interpretation of the Nurses' CBA.

A magistrate judge concluded otherwise. She recommended that the motion to remand be denied, holding that "most of [Allen's] claims substantially depend on an analysis of the CBA, and, thus, are preempted."[14] Alternatively, the magistrate judge decided, Allen was "taking the opposite position now than she took in the arbitration" regarding whether the Committee's actions were governed by the Nurses' CBA's substantive standards, and was therefore judicially estopped from arguing that they were not. Allen filed no objection to the Findings and Recommendation, and the district court adopted it.

---

[13] On remand, the Credentialing Committee again denied Allen's credentialing application, and her union declined to pursue arbitration. Those subsequent developments are not at issue in this appeal.

[14] NWP conceded that Allen's defamation claim was not preempted.

Following limited discovery, Allen filed a motion for reconsideration of the motion to remand, as well as a Fourth Amended Complaint, in which she abandoned all of her substantive claims except for defamation. NWP filed a motion for summary judgment on the defamation claim. The district court denied the motion for reconsideration and granted NWP's motion for summary judgment. We affirm.

## B. *Judicial Estoppel*

Before turning to the substance of the preemption issue, we address the district court's alternative holding—that Allen's central argument is barred by judicial estoppel. "We review the district court's application of the doctrine of judicial estoppel to the facts of this case for an abuse of discretion." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton*, 270 F.3d at 782. Three factors "inform the decision whether to apply the doctrine in a particular case." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001): "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* (quoting *United States v. Hook*, 195 F.3d 299 (7th Cir. 1999)). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *Id.* (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)). "A third consideration is whether the party seeking to assert an

inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

The district court concluded that judicial estoppel barred Allen from arguing for remand on the ground that the Credentials Committee's adverse recommendation was not governed by the Nurses' CBA. As the district court recognized, however, the contrary position was taken by Allen's *union*, not Allen herself, during the arbitration.

It is a core principle of labor law that "[t]he collective bargaining system . . . of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." *Vaca*, 386 U.S. at 182. As a corollary of this principle, a union representing an individual in an arbitration proceeding has an obligation first to act for the benefit of the bargaining unit as a whole, even where the interests of the bargaining unit may diverge from those of the individual grievant. *See id.*; *Local 13, Int'l Longshoremen's & Warehousemen's Union v. Pac. Mar. Ass'n*, 441 F.2d 1061, 1067 (9th Cir. 1971).

We thus have recognized that when a union attorney appears on behalf of an individual during a grievance proceeding, while "the attorney may well have certain ethical obligations to the grievant, his principal client is the union; it is the union that has retained him, is paying for his services, and is frequently the party to the arbitration proceedings." *Peterson v. Kennedy*, 771 F.2d 1244, 1258 (9th Cir. 1985). *Peterson* held that a union member could not sue a union lawyer for malpractice on the basis of the lawyer's handling of a grievance because there was no attorney-client relationship between the lawyer and the union member. *Id.*

at 1261. For the same reason—because there was no attorney-client relationship between Allen and her union attorney during the arbitration—the attorney's argument about the applicability of the Nurses' CBA, made on behalf of the union, cannot be imputed to Allen for judicial estoppel purposes. Because Allen herself took no position at all during the arbitration, her litigating position cannot be "clearly inconsistent" with a nonexistent earlier position. The district court thus abused its discretion in concluding that judicial estoppel barred her argument about the applicability of the Nurses' CBA.

## C. Section 301 Preemption

Like the parties' arguments, our preemption discussion focuses on Allen's claim for intentional interference with economic relations. As we have noted, *see* Section IV.A, *supra*, Allen's Fourth Amended Complaint dropped that claim. But, "[i]n determining the existence of removal jurisdiction, based upon a federal question, the court must look to the complaint *as of the time the removal petition was filed*. Jurisdiction is based on the complaint as originally filed and not as amended." *Abada v. Charles Schwab & Co.*, 300 F.3d 1112, 1117 (9th Cir. 2002) (quoting *O'Halloran v. Univ. of Wash.*, 856 F.2d 1375, 1379 (9th Cir. 1988)) (internal quotation marks omitted). Our preemption analysis, therefore, must take into account Allen's claims at the time of removal, including her claim for intentional interference.

At first blush, Allen's intentional interference claim does not appear to fit comfortably into either prong of the *Burnside* test. Allen argues that NWP, a third party to her employment relationship with HP acting through the Credentialing Committee, caused her discharge by its misconduct during

the course of the credentialing process. As she points out, the Nurses' CBA governs only her relationship with HP; it says nothing at all about the credentialing process. On its face, therefore, her "asserted cause of action involves a right"—the right to be free from harmful interference by a third party in an employment relationship—"conferred upon an employee by virtue of state law, not by a CBA." *Burnside*, 491 F.3d at 1059. And by the same token, she argues, evaluating the merits of her claim cannot be "'substantially dependent on analysis of a collective-bargaining agreement'" that is silent on the relevant issues. *Id.* (quoting *Caterpillar*, 482 U.S. at 394).

But our analysis cannot end there. Under longstanding labor law principles, the scope and meaning of a collective bargaining agreement is not limited to the text of the agreement. Instead, "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581–82 (1960). Because of the centrality of industrial common law in collective bargaining relationships, when an arbitrator interprets a collective bargaining agreement, he is "entitled, and is even expected, to range afield of the actual text of the collective bargaining agreement he interprets." *Stead Motors of Walnut Creek*, 886 F.2d at 1206. The arbitrator's decision, in turn, conclusively determines the meaning of the agreement. *See Misco*, 484 U.S. at 38. Thus where, as here, a plaintiff's initial claim did progress through arbitration, the question whether that claim is based on a right conferred by the CBA must be considered in light of the arbitrator's decision.

Put differently, for preemption purposes, an employee may assert a right that arises from a CBA as interpreted by an arbitrator even where the right is not explicitly mentioned in the text of the agreement. *See Lueck*, 471 U.S. at 215–16. That is precisely what happened in this case. Even though the Manual, in terms, limited the Committee to making a recommendation and provided that only HP itself could take "corrective action" subject to the just cause standard, the arbitrator relied on the functional understanding of the parties to the Nurses' CBA regarding the nature and effect of the Committee's recommendation. Because the parties agreed that Allen's credentials were, as a practical matter, terminated by the Committee's decision, and that that decision directly precipitated her termination, the arbitrator ruled, the Committee' decision must be evaluated under the just cause standard of the Nurses' CBA. In other words, the arbitrator relied on the "industrial common law"—the "practices of the industry and the shop," *Warrior & Gulf Nav. Co.*, 363 U.S. at 581–82—to interpret the just cause provision as extending to the actions of the Credentials Committee. Under this interpretation, Allen's allegation in her complaint at the time of removal concerning the conduct of the Committee is necessarily an allegation that she was fired without just cause in violation of her CBA.

In short, the arbitrator *decided* the question raised under the first *Burnside* factor—whether Allen's claims arise out of the Nurses' CBA or, rather, "exist independently" of it. In asking us to conclude that her claims are independent of the Nurses' CBA, Allen is, in effect, asking us to overturn the arbitrator's interpretation of the contract. That we cannot do.

One of the central goals of LMRA preemption is "preserv[ing] the central role of arbitration in our 'system of

industrial self-government." *Lueck*, 471 U.S. at 219 (quoting *Warrior & Gulf Nav. Co.*, 363 U.S. at 581). *Lueck* recognized that "[a] rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.* at 220 (citation omitted). And an arbitrator's interpretation of a collective bargaining agreement is conclusive; a reviewing court cannot second-guess it. "[E]ven if we were convinced that the arbitrator misread the contract or erred in interpreting it, such a conviction would not be a permissible ground for vacating the award." *Sw. Reg'l Council of Carpenters v. Drywall Dynamics, Inc.*, 823 F.3d 524, 530 (9th Cir. 2016) (quoting *Va. Mason Hosp. v. Washington State Nurses Ass'n*, 511 F.3d 908, 913–14 (9th Cir. 2007)). Indeed, "[s]ince the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot 'misinterpret' a collective bargaining agreement." *Stead Motors*, 886 F.2d at 1205. In this sense, "his award *is* their contract." *Id.* (quoting Theodore J. St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at* Enterprise Wheel *and its Progeny*, 75 Mich. L. Rev. 1137, 1140 (1977)); *see also Lueck*, 471 U.S. at 219.

Here, the arbitrator's award determined that Allen's claims came within the scope of the Nurses' CBA, and the arbitrator then determined the appropriate remedy under that agreement. That "award, just as a contract, is the expression of the parties' will and must be enforced as expressed." *Stead Motors*, 886 F.2d at 1206. Just as an award more strongly in Allen's favor would have bound her employer in any subsequent litigation, so too must Allen abide by the arbitrator's understanding of the meaning and reach of the

CBA.

We therefore agree with the district court that Allen's non-defamation claims are preempted under § 301, because they involve rights arising under her CBA.[15] Because those claims were preempted at the time of removal, the district court properly denied Allen's motion to remand and retained jurisdiction over her  remaining claims.

## D.  Summary Judgment on Allen's Defamation Claim

As noted, *supra*, note 14, NWP concedes that Allen's defamation claim is not preempted. The district court granted summary judgment to NWP on that claim for three separate reasons: (1) the claim was time-barred; (2) Allen failed to allege any defamatory statements; and (3) NWP was protected by qualified privilege.[16] We agree that the claim

---

[15] Because we affirm the preemption issue on this ground, we do not consider NWP's alternative argument that any error on the part of the district court was invited by Allen's amendment of her complaint.

[16] Allen argues that the district court abused its discretion by denying her discovery at two different points. We disagree. "Broad discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed 'except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant.'" *Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317, 1321 (9th Cir. 1988) (quoting *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)) (some internal quotation marks omitted). No such showing has been made.

We further agree with the district court that Allen waived any argument that the district court improperly considered documents not referenced in the compliant.

was time-barred and affirm on that basis.[17]

The statute of limitations for a defamation claim in Oregon is one year. Or. Rev. Stat. § 12.120(2). Allen filed her complaint on December 29, 2011.[18] Allen's complaint was based on statements allegedly made to the Credentials Committee by Dr. Hotaki in 2008, well prior to December 29, 2010.

Allen's injury from the defamatory statements, according to her own complaint, was her "discharge" from HP in 2008, which "injured her professional reputation." This injury flowed from the discharge itself; if anything, the arbitrator's decision *cured* her injury, by vacating the recommendation of the Credentials Committee. The reputational injury began well outside the limitations period. Further, to the extent that Allen argues that her injury was the arbitrator's refusal to "make Allen whole" with an award of back pay, the denial of a retrospective remedy was not itself the tortious injury; the injury, instead, was her loss of income as a result of her loss of reputation.

Finally, although Allen argued to the district court that she could not have been aware of the allegedly defamatory

---

[17] We also affirm the district court's grant of summary judgment on Allen's claim for "equitable relief" based on a supposed separate contract between her and NWP. Allen never presented any evidence of such a contract.

[18] The district court stated that Allen had filed her initial complaint "on some unspecified date (but after November 2011)." Allen gives a specific date in her briefing on appeal. Whether the complaint was filed on December 29 or December 1 (the earliest possible date according to the district court) makes no difference.

statements until the arbitrator issued his written decision on February 18, 2011, in her briefing on appeal she states that she became aware of the statements upon attending the arbitration hearings, the last of which took place on November 23, 2010. That date is also prior to December 29 (or December 1), 2010. So Allen's defamation claim was filed more than a year after her awareness of the defamatory statements. Thus, even if one focuses on when Allen became aware of the defamatory statements themselves, the limitations period had expired when the suit was filed.

Contrary to Allen's submission, equitable tolling cannot excuse her default. As the district court noted, "[e]quitable tolling is used sparingly in Oregon." *Rodriguez v. Williams*, No. CIV. 08-290-ST, 2010 WL 1542092, at *3 (D. Or. Feb. 25, 2010) *report and recommendation adopted*, No. CV 08-290-ST, 2010 WL 1541962 (D. Or. Apr. 14, 2010) *aff'd*, 447 F. App'x 850 (9th Cir. 2011). Allen has put forward no plausible argument to excuse her failure to comply with the statute of limitations.

For these reasons, we affirm the district court's grant of summary judgment to NWP on statute of limitations grounds.

### Conclusion

In *Kobold*, we **AFFIRM** the district court's grant of summary judgment to Good Samaritan. In *Barr*, we **AFFIRM** the district court's grant of summary judgment to RISG as to Barr's money had and received claim, but **REVERSE** as to Plaintiffs' Or. Rev. Stat. § 652.610(4) and breach of fiduciary duty claims, and **REMAND** to the district court to decide whether to exercise supplemental jurisdiction over the § 652.610(4) and breach of fiduciary duty claims. In

*Allen*, we **AFFIRM** the district court's denial of Allen's motion to remand as well as its grant of summary judgment to NWP.